112 T.C. No. 19


UNITED STATES TAX COURT


GENERAL MOTORS CORPORATION AND SUBSIDIARIES, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 27026-96.                    Filed May 25, 1999.


        GM and GMAC are members of a consolidated group.
GM manufactured motor vehicles.  GMAC financed motor
vehicles.

        Held:  The consolidated return regulations in
issue constituted a method of reporting and not a
method of accounting.  Henry C. Beck Co. v.
Commissioner, 52 T.C. 1 (1969), affd. per curiam 433
F.2d 309 (5th Cir. 1970), and Henry C. Beck Builders,
Inc. v. Commissioner, 41 T.C. 616 (1964), followed.

        Held, further,  GM's rate support deductions are
not subject to deferral pursuant to sec. 1.1502-
13(b)(2), Income Tax Regs.


        Raymond P. Wexler, Todd F. Maynes, and William R. Welke, for

petitioner.

        Nancy B. Herbert and John A. Guarnieri, for respondent.

OPINION

VASQUEZ, <u>Judge</u>:  Respondent determined a deficiency of $339,076,705 in petitioner's 1985 consolidated Federal income tax.  The issues in this case, the rate support and special tools issues, have been bifurcated for separate resolution.  This opinion addresses the rate support issues.

After concessions by the parties,[1] the issues for decision are:  (1) Whether General Motors Corporation (GM) and its consolidated affiliated subsidiaries (together, the GM group) changed its method of accounting, and (2) whether section 1.1502-13(b)(2), Income Tax Regs., requires GM to defer its deduction of "rate support" payments.[2]

---

[1]  Petitioner concedes that for 1985 it is not entitled to deduct (1) $57,532,843 for retail rate support payments incurred by GM, (2) $233,071,869 for retail rate support payments GM did not bill until 1986, and (3) $1,557,226 for fleet rate support payments GM did not bill until 1986.  Respondent concedes that for 1985 (1) petitioner's income should not be increased by $119,004,997 on account of estimated refunds of retail rate support payments, and (2) petitioner is entitled to $13,572,139 in deductions for fleet rate support payments.

Additionally, the parties agree that petitioner, in computing its taxable income for 1985, is entitled to claim foreign tax credits in the amount of $101,000,636 arising from carrybacks from 1986 and 1987.

[2]  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Background

Most of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, the stipulation of partial settlement, the stipulation of settled issues and the attached exhibits are incorporated herein by this reference. At the time it filed the petition, GM had its principal place of business in Detroit, Michigan.

I. General Background

GM is a corporation duly organized under the laws of the State of Delaware, doing business directly and through subsidiaries in the United States and abroad. For 1985 and all relevant prior and subsequent years, GM filed a consolidated Federal income tax return, Form 1120, on a calendar year basis on behalf of GM and its consolidated affiliated subsidiaries within the meaning of section 1504. In 1985 and all relevant prior and subsequent years, General Motors Acceptance Corporation (GMAC), a wholly owned subsidiary of GM, was part of the GM group. GM and GMAC both maintain their books and records, and report their income for Federal income tax purposes, using the accrual method of accounting.

At all relevant times, GM was a multiplant manufacturing enterprise primarily engaged in the design, manufacture, assembly, and sale of motor vehicles (including automobiles, trucks, and buses) and related parts and accessories.

In 1919, GMAC was incorporated under the New York banking law relating to investment companies. Operating directly and through subsidiaries and associated companies in which it has equity investments, GMAC provides a wide variety of financial services to its customers.

GMAC and its subsidiaries' principal business is to finance the acquisition and resale by independent GM dealers of various new automotive and nonautomotive products manufactured by GM and to acquire from independent GM dealers, either directly or indirectly, installment obligations covering retail sales of GM products as well as used units of any make. Additionally, GMAC acquired from independent GM dealers installment obligations covering new products of other (i.e., non-GM) motor vehicle manufacturers where the independent GM dealers also owned and operated non-GM motor vehicle dealerships. As a purchaser of installment obligations, GMAC faces competition from finance companies and most banks. Banks also finance car loans directly with customers; however, GMAC does not provide this service.

GMAC also offered other financial services to independent GM dealers. These services included providing inventory financing for both new and used vehicles, insurance, real estate lending, financing of service machinery and mechanical equipment, and other related services.

II.  Independent GM Dealers' Relationship With GM and GMAC

A.  General Background

GM sells the motor vehicles it manufactures to the public primarily through a network of independently owned dealerships (i.e., independent GM dealers).  These independent GM dealers purchase GM motor vehicles from GM for resale to individual customers, businesses, leasing companies, and other entities.  Some of these customers (e.g., businesses and leasing companies) are "fleet customers".  Fleet customers purchase large volumes of motor vehicles in a single transaction.

When a retail customer[3] purchased a vehicle from an independent GM dealer, the retail customer could (1) pay cash for the entire purchase price, (2) purchase the vehicle using third-party financing, or (3) execute a retail installment sales contract (RISC) with the independent GM dealer under which the retail customer agreed to pay for the vehicle over the term of the contract at a stated interest rate.  Under the terms of the RISC, the independent GM dealer could (1) hold the RISC for its own account, (2) assign the RISC to a lender unrelated to GM or GMAC, or (3) assign the RISC to GMAC.

If the independent GM dealer assigned the RISC to GMAC, GMAC acquired the RISC at a price based on GMAC's "buy rate" (which

_____

[3]  The term "retail customers" refers to all purchasers who were not fleet customers.

was also known as the "market discount" rate).  GMAC's buy rate reflected a market rate of interest.  If the interest rate the RISC carried equaled the GMAC buy rate, GMAC paid face value for the RISC.

Independent GM dealers were not legally required to assign any RISC to GMAC, and GMAC was not legally required to accept any RISC offered by an independent GM dealer to GMAC.  GMAC, however, accepted assigned RISC's from independent GM dealers provided the retail customer and the terms of the RISC met GMAC's credit standards.

During 1985, for approximately 41 percent of all GM vehicles sold by independent GM dealers, the customer executed an RISC with the independent GM dealer, and the independent GM dealer then assigned the RISC to GMAC.  This represented GMAC's highest market share since 1931.

Between 1984 and 1986, GMAC accepted assignment of approximately 75 percent of the total number of RISC's that independent GM dealers offered to GMAC.  GMAC conditionally accepted another 10 percent of such RISC's subject to the retail customer increasing his or her downpayment or adding a cosigner. GMAC rejected approximately 15 percent of the RISC's independent GM dealers offered to GMAC.

    B.  Dealer Finance Income

    "Dealer finance income", "dealer allowance credit", and
"dealer participation" are terms used to describe certain amounts
paid or credited by GMAC to independent GM dealers in connection
with the assignment of an RISC by an independent GM dealer to
GMAC.[4]  Dealer finance income was produced when an independent GM
dealer assigned to GMAC an RISC bearing an interest rate that is
higher than the GMAC buy rate.

    When GMAC acquired an RISC from an independent GM dealer,
GMAC paid or credited the independent GM dealer the fair market
value of the assigned RISC at the time of purchase.  The fair
market value was computed using the GMAC buy rate (i.e., the RISC
was discounted to present value based on the GMAC buy rate).
When a retail customer's RISC carried an interest rate greater
than the GMAC buy rate, the fair market value was higher than the
face amount of the RISC, and the amount GMAC paid in excess of
the face amount of the RISC was dealer finance income.[5]  If the
retail customer paid off its RISC early, the independent GM

_____

    [4]  For convenience, we shall hereinafter refer to these
terms as dealer finance income.

    [5]  The opinion, infra pp. 32-38, contains examples
calculating dealer finance income and rate support payments and
explaining GM's and GMAC's accounting for rate support.  For an
example of dealer finance income, see infra p. 32.

dealer credited back to GMAC a portion of the dealer finance income.

A retail customer's RISC seldom carried an interest rate below GMAC's buy rate when the motor vehicle was not covered by a retail rate support program.[6]  See infra pp. 10-19 (discussing retail rate support programs).  In that case, the fair market value of the RISC was lower than the face amount of the RISC. GMAC paid or credited the independent GM dealer less than the face value of the RISC (so that the effective yield to GMAC on the RISC equaled the GMAC buy rate).  This reduced the income the independent GM dealer received on the sale of the vehicle.

III.  Incentive Programs

A.  GM Incentives to Independent GM Dealers to Purchase/Sell GM Vehicles

In 1985, there were numerous programs in effect that GM had established to provide financial incentives to independent GM dealers to purchase and sell more GM motor vehicles (dealer incentives).

---

[6]  This was because if the RISC carried a below-market interest rate the independent GM dealer forwent money on the sale of the car.  This money was "lost" because the independent GM dealer credited the face value of the RISC towards the retail customer's purchase price of the vehicle even though the RISC carried a below-market interest rate (i.e., the RISC's fair market value at the time of purchase was less than its face value at the time of issuance).  Thus, the independent GM dealer forwent the difference between the face value and fair market value of the RISC.

One dealer incentive program involved the payment of "close out allowances" to independent GM dealers. Under the terms of the sale from GM to an independent GM dealer, if the independent GM dealer could not resell a vehicle by a specified date, GM paid a "close-out allowance" to the independent GM dealer. Close-out allowances were intended to encourage independent GM dealers to purchase and stock current model year vehicles.

Other dealer incentives included cash payments tied to the volume of vehicles either sold by the independent GM dealer or purchased from GM by the independent GM dealer. These dealer incentives might apply to particular vehicle lines or to total numbers of vehicles sold or purchased. Various sales incentives were also paid to dealership salespeople.

Independent GM dealers were also given the opportunity to purchase certain upgrades or option packages for certain vehicle models at either a reduced or no additional cost.

B. Retail Customer Incentives

In addition to dealer incentives, GM established programs involving retail customer incentives to increase sales of GM motor vehicles. GM retail customer sales incentives included: (1) Cash rebates and incentive packages, (2) discount option packages, (3) reduced financing rates made available through GMAC, and/or (4) allowing the purchaser to delay the initial

monthly payment to GMAC due on the retail customer's RISC for a stated period.

###### C. Oversight of Incentive Programs

During the 1980's, GM's "Price Review Group" made the decision to provide dealer incentives, incentives to dealership salespeople, and retail sales incentives.

###### D. Retail Rate Support Programs

###### 1. History and Overview

Around 1980, the domestic car market in the United States was extremely depressed. The United States was coming off the second oil shock. In 1980, GM incurred only the second year of losses in its history. It was a traumatic time for GM, and there was a lot of effort and work going on at GM to try to stimulate sales of motor vehicles.

At this time, GM was offering direct rebates to customers; however, the programs were not effective at increasing sales of GM vehicles to the desired levels. GM executives believed that sales were depressed due to the very high interest rates that were present in the U.S. economy at the time. During 1980, the prime rate of interest hit a high of approximately 21 percent.

GM was considering using sales allowances to try to find something that was more attractive to customers than rebate programs, which had lost their luster in the then existing high interest rate environment. In 1980, GM executives made proposals

to create a program to address the issue of high interest rates. The proposals suggested a program by which retail customers could finance GM vehicles at a below-market interest rate.

The car divisions (i.e., Chevrolet, Buick, GMC, Pontiac, Oldsmobile, and Cadillac)[7] initially opposed retail rate support programs.  These proposals were not implemented in 1980 due to perceived administrative difficulties and a lack of the necessary internal support.

In 1981, GM executives again made proposals to address the issue of high interest rates.  This time, GM initiated programs through GMAC which made below-market interest rate financing available to retail customers who purchased GM vehicles (the retail rate support program).  The motivation for the program included stimulating retail demand for cars and increasing market penetration.

GMAC's initial reaction to the initial proposed retail rate support program was negative.  GMAC was concerned with the impact of the retail rate support program on independent GM dealers, who were GMAC's customers, and the independent GM dealers' ability to earn dealer finance income.  See supra pp. 7-8.  GM's initial

---

[7] The parties referred to the different divisions of GM (i.e., Chevrolet, Buick, GMC, Pontiac, Oldsmobile, and Cadillac) as "marketing divisions", "car divisions", and "vehicle divisions" of GM.  For clarity and uniformity, we shall refer to them as car divisions.

proposals for rate support programs involved GMAC's bearing a cost of such programs, and GMAC refused to bear such costs. GMAC's position was that its margins did not allow it to absorb these costs. GMAC considered these costs a cost of selling automobiles that should be borne by GM. GM eventually decided to pay these costs.

The first retail rate support program, initiated in July 1981, included all U.S. car divisions. The initial retail rate support proposal was quite successful. It was more effective than GM executives hoped, and sales increased more than GM expected.

In 1981, when GM first announced retail rate support programs, GMAC immediately contacted its lenders and credit rating agencies to inform them that (1) GMAC's margins were not going to be adversely affected by such programs, (2) GM, and not GMAC, was bearing the costs of such programs, and (3) GMAC was earning its normal rate of return on RISC's entered into by retail customers under a retail rate support program (rate-supported RISC).

### 2. Nuts and Bolts of a Retail Rate Support Program

Retail rate support programs involved GM's central management, GM's car divisions, independent GM dealers, and GMAC. The purpose of the retail rate support programs was to spur the

sale of GM vehicles by independent GM dealers so that GM could sell more vehicles to the independent GM dealers.

Vehicles sold under a retail rate support program were financed at an interest rate below the prevailing market interest rate. Independent GM dealers who participated in the program were required to advertise the below-market interest rate to their retail customers. As discussed earlier, independent GM dealers were not able to earn dealer finance income from GMAC on the rate-supported RISC's. In order to encourage independent GM dealers to participate in retail rate support programs, GM paid independent GM dealers who had been using GMAC's services a stated fraction of the average dealer finance income the independent GM dealer had earned on nonrate-supported RISC's during a previous base period. Such payments were described as representing a percentage of the independent GM dealers' normal dealer financing income. Independent GM dealers who had not been using GMAC's services were paid a stated fraction of the average dealer finance income that other independent GM dealers in the same geographic area earned on nonrate-supported RISC's during a previous base period.

Retail rate support programs were structured as follows:

(1) GM sold its vehicles to independent GM dealers.

(2) GM's car divisions prepared proposals to use a portion of their sales allowance budget on a retail rate

support program. The car divisions submitted the proposal to GM's operating analysis section (OAS), which was part of the GM comptroller's staff. OAS worked with the car divisions in preparing the financial analysis and a proposal for the price review group. The proposal suggested the vehicles to be covered, the interest rate to be offered, and the period of time the program would be in effect.

(3) The price review group reviewed the proposal. In deciding whether to approve a retail rate support program, the price review group considered projections of income impact to the affected GM car divisions and GMAC based on the cost of the program plus the gain from projected increased vehicle sales. The price review group's consideration of projected income impact included projected increased contract penetration by GMAC.

The price review group also considered the "gross stock days supply" with proposed vehicle lines chosen to address "days supply" problems of specific car divisions. "Gross stock" is the number of vehicles that are in the field available for sale. The "days supply" is the projected number of days it would take to sell that gross stock.

The price review group evaluated some programs and found that the entire expected sales increase would be "pull ahead" sales. Pull ahead sales were sales GM reasonably

expected to occur in the ensuing period[8] if there were no retail rate support program in place. Thus, there was no anticipated increase in the number of sales of GM motor vehicles, but the sales would occur earlier with a retail rate support program in place than they would otherwise.

The price review group also considered the impact of "plus" sales. Plus sales were additional GM cars projected to be sold because of the retail rate support program.

GM's price review group, based on the recommendation of GM's marketing personnel, set the below-market interest rate to be offered based on the market for particular vehicles and competitive conditions.

(4) After approval by the price review group, the proposal went to GM's executive committee. The executive committee either approved or rejected the proposal. If approved, GM notified the car divisions in writing and the independent GM dealers through an electronic dealer communication system (DCS) of the retail rate support program. The DCS message identified the car models covered, the period of time the retail rate support program was in effect, and the amount of dealer finance income that would be earned (or lost) by participating in the program.

---

[8] We assume that this refers to the next financial period.

(5)  In order to participate in a retail rate support program, independent GM dealers had to elect to be in the program.

(6)  The retail rate support program required participating independent GM dealers to charge the retail customers an interest rate that was no higher than the below-market interest rate offered under the retail rate support program.

(7)  GM (through its car divisions), GMAC, and the independent GM dealers announced the retail rate support program to the public.

Interest rates in a retail rate support program often varied based on the term of the RISC.  Generally, an RISC with a term of 49-to-60 months bore a higher interest rate than an RISC with a term of 48 months or less.

3.  Sale of a Car

When a participating independent GM dealer sold a qualifying vehicle to a retail customer under a retail rate support program, the customer could elect to make a cash downpayment and finance the balance of the purchase price not paid in cash.  The retail customer satisfied the balance due by entering into an RISC with the independent GM dealer at the below-market interest rate established under the rate support program.  The independent GM dealer credited the face value of the RISC towards the retail

customer's purchase price of the vehicle even though the RISC carried a below-market interest rate (i.e., the RISC's fair market value at the time of purchase was less than its face value at the time of issuance).  If the participating independent GM dealer offered to assign the RISC to GMAC and GMAC accepted the RISC, GMAC paid or credited the independent GM dealer an amount equal to the face value of the RISC (which was greater than the RISC's fair market value at the time of purchase).[9]

### 4.  The Retail Rate Support Payment

When GMAC acquired a retail customer's RISC carrying a below-market interest rate (i.e., a rate-supported RISC) from an independent GM dealer, GM paid (or credited to) GMAC an amount (the retail rate support payment) equal to the difference between the face amount of the RISC and the fair market value discounted at GMAC's buy rate.[10]  GM paid GMAC the rate support payment to

---

[9]  GMAC never paid an independent GM dealer more than the fair market value for an RISC in the absence of a retail rate support program because GMAC's margin for profit on an individual RISC was very small.  If GMAC paid more than the fair market value for an RISC without receiving a retail rate support payment, GMAC would have experienced a loss on the RISC (i.e., the expenses would have exceeded the income on the RISC).

[10]  The retail rate support payment GM made to GMAC represented the difference between the amount GMAC paid the independent GM dealer for the RISC under a retail rate support program and the amount GMAC would have paid the independent GM dealer for the RISC in the absence of such a program.

reimburse GMAC for the amount GMAC paid the independent dealer in excess of the RISC's fair market value at the time of purchase.

For RISC's executed before 1985, if the retail customer prepaid the RISC held by GMAC, GMAC returned (or credited) to GM a portion of the retail rate support payment that GM had previously paid (or credited) to GMAC.

Beginning in 1985, GM and GMAC began to take anticipated retail customer prepayments into account in determining the amount of the retail rate support payments GM paid to GMAC. This reduction in the amount of the retail rate support payments was actuarially determined.

During 1985, GM reduced the retail rate support payments it made to GMAC by 7 percent to take account of anticipated prepayments. In 1985, if a retail customer prepaid an RISC, GMAC was not obligated to return to GM any portion of the retail rate support payment GMAC received from GM on that RISC because anticipated payments were taken into account in determining the amount of the retail rate support payments.

GM made retail rate support payments to GMAC as an up front, lump sum payment. This treatment was similar to the treatment of direct rebate programs--car divisions charged the whole amount to their sales allowance budget.[11] GMAC wanted the retail rate

---

[11] From 1985 to the present, the retail rate support
(continued...)

support payment up front because GMAC incurred the expense up front by paying the independent GM dealer an amount in excess of the fair market value of the RISC at the time of its purchase.

    5.  1985 Retail Rate Support Programs

In 1985, GM offered eight retail rate support programs on selected GM vehicles.  These eight programs included the following:

    a.  8.8% financing on Chevrolet and GMC S-10 and S-15 trucks purchased between February 1, 1985 and April 30, 1985;

    b.  8.8% financing on J and P model passenger cars purchased between March 20, 1985 and April 30, 1985;

    c.  8.8% financing on Chevrolet Cavalier, Pontiac Sunbird, Cadillac Seville and Eldorado, Chevrolet S-10 Blazer and GMC S-15 Jimmy, Oldsmobile Calais, and Buick Somerset models purchased between May 1, 1985 and August 15, 1985;

    d.  9.9% financing on Buick Electra and Oldsmobile Ninety-Eight Regency models purchased between June 21, 1985 and August 15, 1985;

    e.  7.7% financing on a wide variety of 1985 model Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, and GMC vehicles purchased between August 15, 1985 and October 2, 1985;

    f.  8.8% financing on a wide variety of 1985 model Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, and GMC vehicles purchased between October 7, 1985 and November 20, 1985;

---

[11](...continued)
program has been a significant part of the sales allowances of GM.  Additionally, retail rate support payments continue to be charged against the car divisions' sales allowance budget.

g.   8.5% financing on "J" passenger cars purchased between December 4, 1985, and December 31, 1985; and

h.   7.9% financing on a wide variety of Chevrolet, Pontiac, Oldsmobile, Buick, Cadillac, and GMC vehicles purchased between December 26, 1985 and February 22, 1986.

6.   Effect of the Rate Support Programs

Retail rate support programs affected the number of units financed by GMAC and GMAC's market penetration.  In 1984, GMAC's number of units financed and market penetration decreased primarily to increased competition for automobile financing and the absence of reduced retail rate programs that had been in effect during most of 1983.  In 1985, GMAC's number of units financed and market penetration increased reflecting the favorable results of various reduced rate programs (including the rate support programs) and other incentives.

In 1985, GMAC's "average earning assets" rose $9.5 billion principally due to the effect of several rate support programs offered throughout the year.

GMAC's 1985 annual report contained the following statement regarding the retail rate support programs:

A number of very successful reduced retail rate programs offered by GMAC in cooperation with General Motors, combined with improved availability of GM products, contributed to the rise in the level of deliveries.  The increased volume of units financed by GMAC under the reduced rate programs resulted in significant growth in retail receivables and lease assets in 1985.

GMAC's 1986 Annual Report also contained similar language.  The

1986 report stated:

> The financial services market continues to be intensely competitive.  GMAC is meeting this challenge with new and improved programs for consumers, dealers and investors.  Most notable last year were the factory-supported, special rate financing plans which contributed to GMAC's record volume and resulted in a significant number of new and more affluent GMAC customers.  During these rate programs, financing volume increased more than 40% and placed great demands on the entire organization.

    7.  <u>Non-GM Rate Support Programs</u>

Some independent GM dealers also operated motor vehicle

dealerships for vehicle manufacturers other than GM (e.g., Nissan

Motor Corporation (Nissan)).  GMAC purchased RISC's from these

independent GM dealers even if the automobile being financed was

not a GM vehicle.  Consistent with this policy, during 1985, GMAC

participated in rate support type programs offered by three non-

GM manufacturers of motor vehicles.

From January 4 through October 2, 1985, GMAC had an

agreement with Nissan to purchase RISC's bearing an 8.8-percent

interest rate from Nissan dealers who sold Nissan trucks to

retail customers.  Under this program, Nissan paid GMAC the

difference between the face amount of the RISC and the fair

market value of the RISC (discounted at the rate of 13.5 percent)

at the time of purchase.

From June 1 through September 15, 1985, GMAC had an agreement with American Isuzu Motors, Inc. (Isuzu), to purchase RISC's bearing an 8.6-percent interest rate from Isuzu dealers who sold Isuzu trucks to retail customers. Under this program, Isuzu paid GMAC the difference between the face amount of the RISC and the fair market value of the RISC (discounted at the rate of 13.5 percent) at the time of purchase.

From October 9 through November 20, 1985, GMAC had an agreement with American Motors Corporation (AMC) to purchase RISC's bearing an 8.8-percent interest rate from AMC dealers who sold (1) Renault Alliance and Encore vehicles, and (2) Jeep Cherokee, Wagoneer, and Comanche vehicles to retail customers. Under this program, AMC reimbursed GMAC the difference between the face amount of the RISC and the fair market value of the RISC (discounted at the rate of 13.25%) at the time of purchase.

IV. GM's and GMAC's Accounting

A. GMAC's Accounting for Rate-Supported RISC's[12]

GMAC accounted for the acquisition of a rate-supported RISC (whether for a GM or non-GM vehicle) as follows: When GMAC purchased the rate-supported RISC, it recorded as assets on its books (1) a "retail customer receivable", and (2) a "rate support receivable". The retail customer receivable was equal to the

---

[12] For an example, see infra pp. 33-34.

face amount of the RISC plus the below-market interest stated in the RISC that was to be paid over the term of the RISC (below-market stated interest). The rate support receivable was equal to the retail rate support payment GM would make to GMAC.

GMAC also recorded two offsetting credit amounts: (1) A cash reduction in the amount paid to the independent GM dealer to purchase the rate-supported RISC, and (2) a contra asset called "unearned income".

The unearned income account balance equaled the face amount of the RISC plus the below-market stated interest (i.e., the total amount the retail customer was to pay GMAC over the term of the RISC) minus the fair market value of the note, based on GMAC's buy rate, at its time of purchase. Thus, the unearned income account included the discount income GMAC earned on a rate-supported RISC and the below-market stated interest. The retail rate support payment, however, was not included in the unearned income account.

The contra asset account was designed so that the RISC was reported in GMAC's published financial statements at its fair market value at the time of its purchase.

When GMAC received the retail rate support payment, GMAC increased its cash by the amount of the retail rate support payment and eliminated the rate support receivable. The unearned income account remained unchanged.

When GMAC acquired a rate-supported RISC from an independent GM dealer, GMAC did not record the rate support payment as income. GMAC recognized the unearned income as earned income on a monthly basis as the retail customer made payments over the term of the RISC. Each month GMAC also reduced the unearned income account on its balance sheet in an amount equal to the amount it recognized as earned income on its income statement.

B. GMAC's Accounting for Nonrate-Supported RISC's[13]

GMAC accounted for the acquisition of a nonrate-supported RISC, whether it carried a market rate of interest or a below-market rate of interest, as follows: When GMAC purchased the RISC, it recorded as an asset on its books a retail customer receivable equal to the face amount of the RISC plus the interest stated in the RISC that was to be paid over the term of the RISC.

GMAC also recorded two offsetting credit amounts: (1) A cash reduction in the amount paid to the independent GM dealer to purchase the RISC, and (2) unearned income equal to the face amount of the RISC plus the stated market stated interest (i.e., the total amount the retail customer paid GMAC over the term of the RISC) minus the fair market value of the note at the time of its purchase. Thus, the unearned income account included the

---

[13] For an example, see infra pp. 35-36.

stated interest plus the discount income GMAC earned if the nonrate-supported RISC bore a below-market rate of interest.

C.  GM's Accounting for Retail Rate Support Payments[14]

GM accounted for its retail rate support payment liability as follows:  When GM's liability first arose, GM recorded a sales allowance in the amount of the retail rate support payment and an accrued liability to GMAC in the amount of the retail rate support payment.  When GMAC actually purchased the RISC from an independent GM dealer and GM made the retail rate support payment to GMAC, GM eliminated the accrued liability and recorded a cash reduction in the amount of the retail rate support payment.  The net effect on GM's balance sheet was a reduction in GM's cash balance in the amount of the retail rate support payment.  There were no subsequent entries.

D.  Consolidated Accounting

GM was required to eliminate intercompany items between GM and GMAC in determining GM's consolidated income and balance sheet.  GM's expense for retail rate support payments was never eliminated in determining the GM group's net book income.  Similarly, unearned income recognized by GMAC over the term of a rate-supported RISC was never eliminated in determining the GM group's net book income.

_____

[14]  For an example, see infra p. 35.

V.   GMAC's Basis in Rate-Supported RISC's[15]

GMAC's reported tax basis in a rate-supported RISC was equal to the net amount of the RISC reported on GMAC's balance sheet.

VI.  Fleet Rate Support Programs

     A.   General Background

During 1985, GM regularly negotiated incentive arrangements for the sale of multiple GM vehicles to fleet customers (fleet vehicles).  The terms of a fleet transaction were set between GM and the fleet customer.  GM sold fleet vehicles to an independent GM dealer[16] who in turn sold the fleet vehicles to the fleet customer.  Depending on the circumstances, delivery of the fleet vehicles might be coordinated through the independent GM dealer or, alternatively, might be delivered by GM directly to the fleet purchaser.  The independent GM dealer, however, was responsible for payment for the fleet vehicles.

In a fleet transaction, because the independent GM dealer actually completed the sale of the fleet vehicles to the fleet customer, the independent GM dealer earned a profit on the fleet transactions.  This profit margin, however, generally was lower than the independent GM dealer's average profit margin on sales to retail customers.  The amount of the independent GM dealer's

---

[15]  For an example, see infra p. 35.

[16]  An independent GM dealer was needed as the seller of record.

profit turned on the fleet customer's buying leverage and the services the independent GM dealer provided to the fleet customer.

In connection with a purchase of fleet vehicles, GM made incentives available to fleet customers. As an incentive to these fleet customers, GM offered below-market interest rate financing through GMAC or offered to assist a fleet customer in obtaining below-market interest rate financing from an unrelated lender. Generally, fleet customers opted to use the below-market financing provided by GMAC, but occasionally fleet customers used below-market financing provided by an unrelated lender.

Unlike sales to retail customers, the independent GM dealer who helped complete a fleet transaction had no role in the financing of the fleet vehicles purchased. The fleet customer did not execute an RISC with an independent GM dealer; instead, GMAC or an unrelated lender lent the money directly to the fleet customers (fleet loans). In fleet transactions, GMAC used a chattel mortgage type financing document. GMAC lent the money to the fleet customers and took a security position in the fleet vehicles as collateral. Any below-market interest rate offered to fleet customers on fleet loans was a reduction in GMAC's otherwise available "lending rate".[17]

---

[17] GMAC established its lending rate the same way it

(continued...)

Upon shipment by GM of a fleet purchase, GM received payment for the fleet vehicles.  In most cases, this payment was made through the independent GM dealer's wholesale financing source.

The fleet customer then borrowed the agreed-upon amount of funds from GMAC or an unrelated lender.  This amount was credited to the independent GM dealer (or, in most cases, the independent GM dealer's wholesale financing source) as consideration for the vehicles.

If the lender made a below-market interest rate loan, GM paid GMAC or the unrelated lender a "fleet rate support payment".  The amount of the fleet rate support payment equaled the difference between the face amount of the fleet loan and the fair market value of the fleet loan at GMAC's lending rate.

B.  GMAC's Accounting for the Fleet Loans[18]

GMAC accounted for the fleet loans as follows:  When GMAC made a fleet loan, it recorded as assets on its books (1) a "fleet purchaser receivable", and (2) a rate support receivable.  The fleet purchaser receivable was equal to the face amount of the loan (i.e., the amount the fleet customer actually borrowed from GMAC).  The rate support receivable was equal to the fleet rate support payment to be made by GM to GMAC.

---

[17](...continued)
determined its buy rate.

[18]  For an example, see infra pp. 36-37.

GMAC also recorded two offsetting credit amounts: (1) A cash reduction in the amount it paid to the independent GM dealer to purchase the rate supported fleet loan, and (2) unearned income.[19] The unearned income account was credited the face amount of the note minus the fair market value of the note at the time of its purchase.[20]

Unlike its treatment of retail rate support payments, GMAC did not record the stated interest in the note as part of the fleet purchase receivable or as unearned income.

When GMAC received the fleet rate support payment from GM, GMAC increased its cash by the amount of the fleet rate support payment and eliminated the rate support receivable. The unearned income account remained unchanged.

GMAC did not include fleet rate support payments in income. GMAC recognized the unearned income as earned income on a monthly basis as the customer made payments over the term of the fleet loan.

--------

[19] The unearned income account in the fleet transactions was a contra asset account that reduced the amount of GMAC's assets and ensured that the fleet purchaser receivable was reported at its fair market value on GMAC's balance sheet.

[20] Thus, the unearned income account included the discount income GMAC earned on a rate supported fleet loan. The fleet rate support payment was not included in the unearned income account.

C. <u>GM's Accounting for the Fleet Rate Support Payments</u>[21]

GM accounted for its fleet rate support payment liability as follows: When GM's liability first arose, GM recorded a sales allowance in the amount of the fleet rate support payment and an accrued liability to GMAC in the amount of the fleet rate support payment. When GMAC actually lent the funds to the fleet customer and GM made the fleet rate support payment to GMAC, GM eliminated the accrued liability and recorded a cash reduction in the amount of the fleet rate support payment. The net effect on GM's income statement was a sales allowance in the amount of the fleet rate support payment, and the net effect on GM's balance sheet was a reduction in GM's cash balance in the amount of the fleet rate support payment.

VII. <u>Tax Return Treatment of Item Related to Retail and Fleet Rate Support Programs</u>

In the relevant taxable years, in computing its separate taxable income, GM treated the retail rate support payments it made to GMAC and the fleet rate support payments made to GMAC and to other unrelated lenders as current deductions by the parent GM (rate support deductions). For purposes of computing its separate taxable income, GMAC treated the discount earned on rate-supported RISC's and rate supported fleet loans (which were mathematically equal to the retail/fleet rate support payment

---

[21] For an example, see <u>infra</u> pp. 37-38.

associated with that RISC/fleet loan that GMAC received from GM) as income over the life of the RISC/fleet loan (rate support discount income).

For taxable years prior to 1985, the GM group reported GM's rate support deductions and GMAC's rate support discount income as intercompany transactions. A consolidation adjustment was made deferring GM's rate support deductions in the GM group's consolidated income tax return until GMAC recognized the discount income.

For 1985 and subsequent years, the GM group did not report GM's rate support deductions and GMAC's rate support discount income as intercompany transactions. GM continued to claim the retail and fleet rate support payments as current deductions when paid (or credited) to GMAC. No consolidation adjustment was made deferring GM's rate support deductions in the GM group's consolidated income tax return.

The GM group did not file, in 1985 or any other relevant year, a Form 3115, Application for Change in Accounting Method, with the Commissioner.

VIII. Claims for Refund

GM filed refund claims with the Internal Revenue Service (IRS) for tax years prior to 1985 on the basis that the deferral of GM's rate support deductions on the GM group's consolidated return for those years was incorrect.

Discussion

I.  Examples

Before reaching our analysis of the applicable law, we set forth some examples of the accounting, tax, and financial aspects of the case at bar that will elucidate the facts of the case. The parties have stipulated the following examples.

A.  Dealer Finance Income

Suppose that when GMAC's buy rate was 8 percent a retail customer entered into an RISC with a principal amount of $10,000, for a term of 48 months, bearing an interest rate of 8.25 percent.  GMAC paid or credited $10,048[22] (the fair market/discounted value of the RISC at 8 percent) to the independent GM dealer for assignment of the RISC to GMAC.  Thus, the independent GM dealer received $48 of dealer finance income (the fair market value of the RISC--$10,048--less the principal amount--$10,000).

B.  Retail Rate Support Payment Calculations

1.  Pre-1985

Suppose a retail customer purchased a vehicle from an independent GM dealer for $12,000 and paid $2,000 in cash and financed the $10,000 balance with a rate-supported RISC with a 48-month term.  The retail rate support program offered 7.9

---

[22]  For convenience, all figures are rounded to the nearest dollar.

percent financing when GMAC's buy rate for a 4-year loan was 12 percent. The monthly payment due on the rate-supported RISC was $244, and the fair market value of the rate-supported RISC at the time of purchase was $9,253.[23] Even though the rate-supported RISC was worth only $9,253, GMAC paid the independent GM dealer $10,000. GM paid GMAC a retail rate support payment in the amount of $747--the difference between the $10,000 face value of the rate-supported RISC and the $9,253 fair market value of the rate-supported RISC at the time of its purchase.

2. 1985 and Post-1985

In 1985 and thereafter, GM's retail rate support payment was adjusted (reduced) for the actuarially determined retail customer prepayments. During 1985, GM reduced the retail rate support payments it made to GMAC by 7 percent to take account of anticipated prepayments. Thus, given the same facts as above for pre-1985, in 1985, the retail rate support payment of $747 would have been reduced to $695.

C. GM and GMAC Financial Accounting

1. Rate-Supported RISC

Suppose a retail customer's RISC had a face amount of $10,000, below-market stated interest of $2,000 to be paid by the customer over the term of the RISC, and a fair market value of

---

[23] The $9,253 figure is arrived at by discounting to present value the 48 monthly payments of $244 by 12 percent.

$9,500, and GM paid GMAC a retail rate support payment of $500

(retail rate support example).

       a.  <u>GMAC</u>

GMAC purchased the RISC from an independent GM dealer for

$10,000, and it recorded the following assets on its books:

```
Retail customer receivable          ¹$12,000
Rate support receivable                  500
```

[1]  This figure included the $10,000 face value of the
RISC and $2,000 below-market interest stated in the
RISC.

GMAC credited the $10,000 it paid the independent GM dealer

for the RISC to its cash account and $2,500 to its unearned

income account.  These items were recorded as follows:

```
Cash                                ($10,000)
Unearned income                     ¹(2,500)
```

[1]  This figure equaled the face amount of the RISC plus
the below-market stated interest (i.e., the total
amount the retail customer was to pay GMAC over the
term of the RISC) minus the fair market value of the
RISC at the time of its purchase.  Thus, the unearned
income account included the discount income and the
below-market stated interest that GMAC earned on the
RISC.

When GMAC received the $500 retail rate support payment from

GM, GMAC increased its cash by $500 and eliminated the rate

support receivable.  The net effect on GMAC's balance sheet was

as follows:

```
Retail customer receivable          $12,000
Cash                                 (9,500)
Unearned income                      (2,500)
```

### b.  GMAC's Basis in a Rate-Supported RISC

In the retail rate support example, GMAC's book and tax basis in the rate-supported RISC was $9,500.

### c.  GM

In the retail rate support example, GM accounted for its retail rate support payment liability as follows:  When GM's liability first arose, GM recorded a $500 sales allowance and a $500 accrued liability to GMAC.  When GMAC actually purchased the RISC from an independent GM dealer and GM made the $500 retail rate support payment to GMAC, GM eliminated the $500 accrued liability and recorded a cash reduction of $500.  The net effect on GM's balance sheet was a $500 reduction in GM's cash balance.

## 2.  Nonrate-Supported RISC

### a.  RISC Bearing a Market Interest Rate

Suppose a retail customer's RISC had a face amount and fair market value of $10,000 and stated interest of $2,500 to be paid by the customer over the term of the RISC.  GMAC purchased the RISC for $10,000, and it recorded the following items on its books:

| | |
|---|---|
| Retail customer receivable | [1]$12,500 |
| Cash | (10,000) |
| Unearned income | [2](2,500) |

[1]  This figure included the $10,000 face value of the RISC and $2,500 interest stated in the RISC.

[2]  This figure equaled the face amount of the RISC plus the stated interest (i.e., the total amount that the

retail customer paid GMAC over the term of the RISC) minus the fair market value of the RISC at the time of its purchase.

### b. RISC Bearing a Below-Market Interest Rate

Suppose a retail customer's RISC had a face amount of $10,000, below-market stated interest of $2,000 to be paid by the customer over the term of the RISC, and a fair market value of $9,500. GMAC purchased the RISC for $9,500, and it recorded the following items on its books:

| | |
|---|---|
| Retail customer receivable | [1]$12,000 |
| Cash | (9,500) |
| Unearned income | [2](2,500) |

[1] This figure included the $10,000 face value of the RISC and $2,000 below-market stated interest.

[2] This figure equaled the face amount of the RISC plus the stated interest (i.e., the total amount the retail customer was to pay GMAC over the term of the RISC) minus the fair market value of the RISC at the time of its purchase.

### 3. Fleet Loans and Fleet Rate Support

Suppose a fleet customer acquired fleet vehicles for $1,100,000 making a $100,000 downpayment in cash and financing the $1 million balance with a note from GMAC with a term of 48 months at an interest rate of 8 percent when GMAC's lending rate was 10 percent. The fair market value of the note at the time of its purchase, therefore, was $957,600.[24] GMAC lent $1 million to

---

[24] The parties stipulated this example and calculated the fair market value of the note to be $957,600 and the fleet rate

(continued...)

the fleet customer who used the $1 million as consideration for the purchase of the fleet vehicles. GM then paid $42,400 to GMAC (altogether, the fleet rate support example).

### a. GMAC

In the fleet rate support example, when GMAC made the loan for $1 million, it recorded the following items on its books:

| | |
|---|---|
| Fleet purchaser receivable | $1,000,000 |
| Rate support receivable | 42,400 |
| Cash | (1,000,000) |
| Unearned income | (42,400) |

When GMAC received the $42,400 fleet rate support payment, GMAC increased its cash by $42,400 and eliminated the rate support receivable. The net effect on GMAC's balance sheet was as follows:

| | |
|---|---|
| Fleet purchaser receivable | $1,000,000 |
| Cash | (957,600) |
| Unearned income | (42,400) |

### b. GM

In the fleet rate support example, GM accounted for its fleet rate support payment liability as follows: When GM's liability first arose, GM recorded a $42,400 sales allowance and

---

[24](...continued) support payment to be $42,400 (the difference between the $1,000,000 face value of the note and the $957,600 fair market value of the note). This appears to be a mathematical error--the fair market value based on a loan with a $1 million principal balance at 8 percent for 48 months when the market rate of interest is 10 percent is $962,557, and the fleet rate support payment therefore is $37,443. For convenience, we shall use the parties' figures.

a $42,400 accrued liability to GMAC. When GMAC actually lent the funds to the fleet customer and GM made the $42,400 fleet rate support payment to GMAC, GM eliminated the $42,400 accrued liability and recorded a cash reduction of $42,400. The net effect on GM's income statement was a $42,400 sales allowance; the net effect on GM's balance sheet was a $42,400 reduction in GM's cash balance.

## II. Change in Method of Accounting

Respondent's primary argument is that the consolidated return regulations constituted a method of accounting, and the GM group's consistent deferral of GM's rate support deduction prior to 1985 established the regular method of accounting for the rate support payments.[25] See sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs. Respondent contends that in 1985 the GM group[26] changed its method of accounting when (1) the GM group stopped reporting GM's rate support payments as intercompany transactions under section 1.1502-13(a)(1), Income Tax Regs., (2) GM continued to claim the rate support payments as current deductions when paid

_____

[25] We use the term "rate support payments" to refer to both the retail rate support payments and fleet rate support payments.

[26] On brief, respondent argues that "GM" changed its method of accounting. Most of respondent's arguments, however, pertain to changes made by the GM group on its consolidated returns. Therefore, we believe that many of respondent's references to GM in respondent's discussion of the change in method of accounting issue are references to the GM group.

(or credited) to GMAC, and (3) the rate support deductions were no longer deferred in the GM group's consolidated income tax return (i.e., no consolidation adjustment was made pursuant to section 1.1502-13(b)(2), Income Tax Regs.). Respondent further argues that this change in the method of accounting could not be effected without the Secretary's consent. See sec. 446(e).

Petitioner counters that the consolidated return regulations in effect for 1985 were not a method of accounting. Furthermore, petitioner contends that respondent is attempting to apply retroactively the 1995 amendments to the consolidated return regulations (1995 amendments), and that this is improper.

A.  The Law

An affiliated group can make a consolidated return with respect to the income tax imposed by chapter 1 in lieu of filing separate returns. See sec. 1501. All members of the affiliated group must consent to the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of a consolidated return. See id. Filing a consolidated return was considered such consent. See id.

Section 1502 provided:

> The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to

reflect the income tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

Furthermore, if a consolidated return was made, the tax was determined, computed, assessed, collected, and adjusted in accordance with the regulations under section 1502 prescribed before the last day prescribed by law for the filing of such return.  See sec. 1503(a).

Section 1.1502-2, Income Tax Regs., explained how a consolidated group determined its tax liability.  It provided, in relevant part, as follows:

> The tax liability of a group for a consolidated return year shall be determined by adding together--
>
> (a) The tax imposed by section 11 on the consolidated taxable income for such year (see [section] 1.1502-11 for the computation of consolidated taxable income); * * *

Section 1.1502-11, Income Tax Regs., provided, in relevant part, as follows:

> (a) <u>In general</u>.  The consolidated taxable income for a consolidated return year shall be determined by taking into account--
>
> > (1) The separate taxable income of each member of the group (see [section] 1.1502-12 for the computation of separate taxable income); * * *

Section 1.1502-12, Income Tax Regs., provided, in relevant part, as follows:

The separate taxable income of a member (including a case in which deductions exceed gross income) is computed in accordance with the provisions of the Code covering the determination of taxable income of separate corporations, subject to the following modifications:

(a) Transactions between members * * * shall be reflected according to the provisions of [section] 1.1502-13 * * * ;

* * * * * * *

(d) The method of accounting under which such computation is made and the adjustments to be made because of any change in method of accounting shall be determined under [section] 1.1502-17;

Section 1.1502-13(b)(1), Income Tax Regs., provided that, generally, gain or loss on intercompany transactions,[27] other than "deferred intercompany transactions", was not deferred or eliminated.  Section 1.1502-13(b)(2), Income Tax Regs., however, contained an exception to this rule:

(2) Special rule.  If, in an intercompany transaction (other than a deferred intercompany transaction), one member would otherwise properly [take] an item of income or a deduction into account for a consolidated return year earlier than the year (whether consolidated or separate) for which another member of the group can properly take into account the corresponding item of income or deduction, then both the item of income and the deduction shall be taken into account for the later year (whether consolidated or separate).  * * *

---

[27]  Sec. 1.1502-13(a)(1), Income Tax Regs., defined the term "intercompany transaction" as "a transaction during a consolidated return year between corporations which are members of the same group immediately after such transaction".

Section 1.1502-17, Income Tax Regs., entitled "Methods of accounting", stated that "The method of accounting to be used by each member of the group shall be determined in accordance with the provisions of section 446 as if such member filed a separate return."

Section 446(a) stated that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books."  Section 1.446-1(a)(1), Income Tax Regs., further provided that "The term 'method of accounting' includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item."

Section 446(c) listed the permissible methods of accounting:

> (c) Permissible Methods.--Subject to the provisions of subsections (a) and (b), a taxpayer may compute taxable income under any of the following methods of accounting--
>
>> (1) the cash receipts and disbursements method;
>>
>> (2) an accrual method;
>>
>> (3) any other method permitted by this chapter;
>>
>> (4) any combination of the foregoing methods permitted under regulations prescribed by the Secretary.

See also sec. 1.446-1(c), Income Tax Regs.

Before a taxpayer could change the taxpayer's method of accounting, the taxpayer needed to secure the consent of the Secretary.  See sec. 446(e).

> (ii)(a) A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan.  * * * A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction.  * * *  [Sec. 1.446-1(e)(2)(ii)(a), Income Tax Regs.]

An accounting practice that involves the timing of when an item is included in income or when it is deducted is considered a method of accounting.  See Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781, 797-798 (11th Cir. 1984); Diebold, Inc. v. United States, 16 Cl. Ct. 193, 198-199 (1989), affd. 891 F.2d 1579 (Fed. Cir. 1989).

B.  Analysis

Respondent argues that the matching rule contained in section 1.1502-13(b)(2), Income Tax Regs., is a method of accounting because the rule affects the timing (i.e., recognition) of corresponding items of income and deduction.

This Court has previously addressed the issue of whether the consolidated return regulations are a method of accounting.  In Henry C. Beck Builders, Inc. v. Commissioner, 41 T.C. 616 (1964) (Henry C. Beck Builders, Inc.), a Court-reviewed opinion, we refused to accept the IRS's argument that the application of the

consolidated return regulations was a method of accounting. See id. at 622. This Court subsequently followed Henry C. Beck Builders, Inc. in Vernon C. Neal, Inc. v. Commissioner, T.C. Memo. 1964-145, and in United Contractors, Inc. v. Commissioner, T.C. Memo. 1964-68, affd. per curiam 344 F.2d 123 (4th Cir. 1965).

In another Court-reviewed opinion issued 5 years after Henry C. Beck Builders, Inc., the Court again rejected the IRS's argument that the intercompany transaction rules contained in the consolidated return regulations were a method of accounting. See Henry C. Beck Co. v. Commissioner, 52 T.C. 1 (1969), affd. per curiam 433 F.2d 309 (5th Cir. 1970) (Henry C. Beck Co.). Citing Henry C. Beck Builders, Inc., the Court stated that "Consolidated returns are not a method of accounting but only a method of reporting." Id. at 7-8. Later in the opinion, we reemphasized this point: "As previously pointed out, it is well settled by decisions of this Court that a consolidated return is merely a method of reporting taxes, not a method of accounting." Id. at 12.

Respondent correctly points out that Henry C. Beck Builders, Inc. and Henry C. Beck Co. involved the consolidated return regulations in effect prior to 1966 (pre-1966 regulations), see Henry C. Beck Co. v. Commissioner, supra at 11-12, and that the case at bar involves the consolidated return regulations the

Treasury adopted in 1966 (1966 regulations) which substantially overhauled the pre-1966 regulations. See T.D. 6894, 1966-2 C.B. 362; 1 Dubroff et al., Federal Income Taxation of Corporations Filing Consolidated Returns sec. 1.02 (2d ed. 1999).

Respondent argues that our decisions in Henry C. Beck Builders, Inc. and Henry C. Beck Co. are therefore irrelevant to the case at bar. Respondent contends that the pre-1966 regulations were an "elimination" system where income, gains, losses, and deductions were zeroed out (eliminated) between members of a consolidated group; therefore, timing questions regarding the reporting of these items could never arise. The 1966 regulations, respondent points out, provided for a "deferral" system where income, gains, losses, and deductions were matched between members of a consolidated group. Respondent argues that timing issues could arise under the 1966 regulations; therefore the 1966 regulations should be characterized as a method of accounting.

Petitioner agrees with respondent that the consolidated return regulations were substantially amended in 1966 and acknowledges that Henry C. Beck Builders, Inc. and Henry C. Beck Co. were decided under the pre-1966 regulations. Petitioner argues, however, that the 1966 regulations did not affect the holdings in Henry C. Beck Builders, Inc. and Henry C. Beck Co.

that the consolidated return regulations were not a method of accounting.

We do not believe that the 1966 regulations undercut the holdings in Henry C. Beck Builders, Inc. and Henry C. Beck Co. that the consolidated return regulations are a method of reporting and not a method of accounting. To the contrary, the 1966 regulations fortify the reasoning contained in Henry C. Beck Builders, Inc. and Henry C. Beck Co.

Respondent adopted sections 1.1502-12(d) and 1.1502-17, Income Tax Regs., as part of the 1966 regulations. These sections provide the rules for determining methods of accounting and changes in method of accounting under the consolidated return regulations.

Section 1.1502-12(d), Income Tax Regs., states that the method of accounting under which the computation of separate taxable income of each member of the consolidated group is made and the adjustments to be made because of any change in method of accounting shall be determined under section 1.1502-17, Income Tax Regs. Section 1.1502-17, Income Tax Regs., entitled "Methods of accounting", states that "The method of accounting to be used by each member of the group shall be determined in accordance with the provisions of section 446 as if such member filed a separate return." Thus, each member (and not the group) determines its method of accounting on a separate company basis--

there is no method of accounting for the group as a whole. Furthermore, section 446 controls the determination of the method of accounting.

Section 446 supports the conclusion that the consolidated return regulations are not a method of accounting. Section 446(c) lists four methods of accounting that are permissible: (1) The cash method, (2) an accrual method, (3) any other method permitted by chapter 1 of the Code, and (4) any permissible combination of the three aforementioned methods. The consolidated return regulations are neither the cash method nor an accrual method. The consolidated return regulations are authorized under chapter 6 of the Code. Section 446(c) and the consolidated return regulations simply do not treat the regulations (or more specifically, the matching rule contained in section 1.1502-13(b)(2), Income Tax Regs.) as a method of accounting. See Vernon C. Neal, Inc. v. Commissioner, T.C. Memo. 1964-220.

Additionally, section 446(a) and (e) refer to the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books. Corporations do not keep their books based on the consolidated return regulations; the consolidated return regulations make adjustments to each corporation's income determined under each corporation's separate method of accounting. The Commissioner's supervisory authority

over accounting methods simply is not implicated here.  See sec. 1.1502-17, Income Tax Regs.

It was not until 1995 that section 1.1502-13, Income Tax Regs., was amended to state that the timing rules contained in the consolidated return regulations are a method of accounting.[28] See sec. 1.1502-13(a)(3), Income Tax Regs., as amended ("The timing rules of this section are a method of accounting for intercompany transactions, to be applied by each member in addition to the member's other methods of accounting."); T.D. 8597, 1995-2 C.B. 147, 162.

Petitioner also argues that on a separate company basis GM and GMAC did not change their respective methods of accounting for the rate support payments or discount income.  We agree.  GM always treated rate support payments as current deductions, and GMAC always recognized discount income over the life of the RISC/fleet loan.  It was only when the GM group filed a consolidated return that, on this return, the GM group deferred the rate support deductions that, according to GM's accounting method, GM was currently deducting.

---

[28] The 1995 amendments are effective as of July 18, 1995, and apply to transactions occurring in years beginning on or after July 12, 1995.  See T.D. 8597, 1995-2 C.B. 147, 185; sec. 1.1502-13(l)(1), Income Tax Regs., as amended.  The 1995 amendments are not before the Court; therefore, we make no conclusions as to whether these amendments are valid.

Furthermore, we do not believe that respondent argues that on a separate company basis either GM or GMAC changed its methods of accounting for the rate support payments or discount income.

Based on the foregoing, we conclude that the consolidated return regulations in effect during the year in issue constituted a method of reporting and not a method of accounting. Therefore, the GM group did not have to obtain the Secretary's consent before changing how it reported the rate support deductions on its consolidated return.

III. Deferral of the Rate Support Payments

Respondent's secondary argument is: (1) The rate support payments GM made to GMAC were part of intercompany transactions subject to the matching rule contained in section 1.1502-13(b)(2), Income Tax Regs.; (2) the corresponding item of income to the rate support deductions was the discount income GMAC earned over the term of the RISC's/fleet loans; and (3) GM should have deferred its rate support deductions until GMAC took the corresponding item of income into account.

Petitioner counters that the rate support deductions were not subject to the matching rule contained in section 1.1502-13(b)(2), Income Tax Regs., because: (1) The rate support payments were not income to GMAC; therefore they could not have been the corresponding item of income to the rate support deductions; (2) the discount income that GMAC earned from

retail/fleet customers was not the corresponding item of income to the rate support deductions; and (3) the discount income was not earned in intercompany transactions.

A.  The Matching Rule

As stated earlier, section 1.1502-13(b)(2), Income Tax Regs., provided in part:

> (2) Special rule.  If, in an intercompany transaction (other than a deferred intercompany transaction), one member would otherwise properly [take] an item of income or a deduction into account for a consolidated return year earlier than the year (whether consolidated or separate) for which another member of the group can properly take into account the corresponding item of income or deduction, then both the item of income and the deduction shall be taken into account for the later year (whether consolidated or separate).  * * *

In 1995, section 1.1502-13, Income Tax Regs., was amended to state the following:  "An item is a corresponding item whether it is directly or indirectly from an intercompany transaction."[29] Sec. 1.1502-13(b)(3)(i), Income Tax Regs., as amended; T.D. 8597, 1995-2 C.B. at 164.

---

[29]  The 1995 amendments are effective as of July 18, 1995, and apply to transactions occurring in years beginning on or after July 12, 1995.  See T.D. 8597, 1995-2 C.B. 147, 185; sec. 1.1502-13(l)(1), Income Tax Regs., as amended.  The 1995 amendments, therefore, are not before the Court.

B.  The Corresponding Item of Income and Intercompany
Transactions

Respondent agrees that the rate support payments were not income to GMAC.[30]  Respondent contends, however, that the corresponding item of income does not have to be from the very same payment that creates the deduction.  Respondent asserts that "income or deduction that flows directly or indirectly from an intercompany transaction constitutes a corresponding item" under section 1.1502-13(b)(2), Income Tax Regs.

We must determine what the regulations meant by "the corresponding item of income".  Three examples contained in section 1.1502-13(h), Income Tax Regs., illustrated what this term meant:

> Example (3).  Corporations P and S file consolidated returns on a calendar year basis and report income on the cash basis.  On July 1, 1966, S pays P $1,000 interest on a loan made in 1961.  The payment of interest is an intercompany transaction

---

[30]  The rate support payments were not income to GMAC; they reduced GMAC's basis in the rate-supported RISC's/fleet loans. This was because the rate support payments induced GMAC to purchase RISC's/fleet loans from independent GM dealers at face value (i.e., GMAC paid independent GM dealers more than fair market value for a below-market RISC/fleet loan only because GM made rate support payments to GMAC for the excess amount paid). See Brown v. Commissioner, 10 B.T.A. 1036, 1054-1055 (1928) (amount received by buyer to induce him to purchase property is a reduction in his cost of the property rather than income to the buyer); Rev. Rul. 73-559, 1973-2 C.B. 299 (basis in acquired mortgage is reduced by the amount of the inducement payment); see also Freedom Newspapers, Inc. v. Commissioner, T.C. Memo. 1977-429; Rev. Rul. 76-96, 1976-1 C.B. 23 (new car purchaser must reduce his basis by amount of manufacturer rebate).

- 52 -

other than a deferred intercompany transaction; S does not defer or eliminate the $1,000 deduction for interest and P does not defer or eliminate the $1,000 item of interest income.  Thus, consolidated taxable income for 1966 reflects interest income of $1,000 and a corresponding deduction for interest of $1,000.

\* \* \* \* \* \* \*

Example (13).  Corporations P and S file consolidated returns on a calendar year basis for 1966 and 1967.  S reports income on the accrual method while P reports income on the cash method.  On December 31, 1966, S would properly accrue interest of $1,000 which is payable to P.  On February 1, 1967, S pays P the $1,000.  Both the deduction and the item of income are taken into account for 1967, the later year.  \* \* \* Consolidated taxable income for 1967 reflects both interest income of $1,000 and a corresponding deduction for interest of $1,000.

\* \* \* \* \* \* \*

Example (16).  Corporations P and S file consolidated returns on a calendar year basis.  On January 10, 1968, P sells an issue of its $100 par value bonds.  S purchases a bond from P for $110.  S does not elect under section 171 to amortize the $10 premium.  P may not take the $10 premium into account as income until it redeems the bond since S cannot properly take a deduction for the $10 premium until the bond is redeemed.

In each of these examples, there was a direct relationship between the income and the deduction.  The money never left the consolidated group, and third parties were not involved.  A single item (payment) within the group was an expense (deduction) for one member of the group and income for another member.

In the case at bar, third parties (the independent GM dealers and retail/fleet customers) were involved, and a single

item (the rate support payment) was not an expense (deduction) for one member of the group (GM) and income for another member (GMAC). The payment GM made to GMAC (which was the deduction) was not directly related to the payments the retail/fleet customers made to GMAC (which contained the discount income).

Additionally, here the money left the consolidated group. Compare the examples of rate supported and nonrate-supported RISC's bearing a below-market rate of interest. See supra pp. 33-36. In the example of a nonrate-supported RISC bearing a below-market rate of interest, GMAC paid the independent GM dealer $9,500. Thus, the GM group's total net expense was $9,500. In the example of a rate-supported RISC, GMAC paid the independent GM dealer $10,000 and GM paid GMAC $500. Thus, the GM group's total net expense was $10,000. Five hundred dollars ($500) more left the GM group when a below-market RISC/fleet loan was rate supported as compared with when there was no rate support.

As respondent pointed out on brief, the matching rule ensures clear reflection of income and prevents the creation of "paper" deductions when the group as a whole has not incurred a net expense. Here, the group had a net expense.

Furthermore, the GM group's additional $500 expense was a real loss of $500 to the GM group. In both the example of a nonrate-supported RISC and a rate-supported RISC bearing a below-

market rate of interest, the RISC's had face values of $10,000 and stated interest of $2,000. See supra pp. 33-36. Thus, if GMAC held the below-market nonrate-supported RISC to maturity the GM group made a $2,500 profit ($12,000 minus the $9,500 paid to the independent GM dealer), or if the customer paid off the RISC immediately the GM group made a $500 profit (the $10,000 of stated principal minus the $9,500 paid to the independent GM dealer). Whereas, if GMAC held the rate-supported RISC to maturity the GM group made a $2,000 profit ($12,000 minus the $10,000 paid to the independent GM dealer), or if the customer paid off the RISC immediately the GM group made no profit (the $10,000 of stated principal minus the $10,000 paid to the independent GM dealer).

The purpose of the consolidated return regulations is to provide rules so that the tax liability of a consolidated group will be clearly reflected and to prevent the avoidance of such tax liability. See sec. 1502. GM and GMAC have not fabricated a transaction where numbers merely are being shuffled on paper without any real loss to the GM group. The GM group's treatment of the rate support deductions and the discount income clearly reflected its tax liability.

Based on the foregoing, we conclude that the discount income was not the corresponding item of income to the rate support deductions.

Even if, however, the discount income was the corresponding item of income, the discount income would have to be part of an intercompany transaction in order for the consolidated return regulations to apply.  See sec. 1.1502-13(b)(2).  Section 1.1502-13(a)(1), Income Tax Regs., defined the term "intercompany transaction" as "a transaction during a consolidated return year between corporations which are members of the same group immediately after such transaction".

GMAC received the discount income from either a retail customer or a fleet customer.  GMAC acquired the right to receive the discount income from an independent GM dealer when the independent GM dealer assigned the RISC/fleet loan to GMAC. Neither the retail/fleet customer nor the independent GM dealer was part of the GM group; therefore the transactions between GMAC and retail/fleet customers and GMAC and independent GM dealers were not intercompany transactions.

The intercompany transaction rules of the consolidated return regulations and the examples therein contemplated a transaction solely within the consolidated group between members of the group and not a situation where income comes from outside the group in a transaction involving third parties.  See section 1.1502-13(a)(1), (b)(2), (h) Examples (3), (13), (16), Income Tax Regs., and the discussion of these examples supra.

Based on the foregoing, we conclude that the discount income was not earned in an intercompany transaction.

C. Conclusion

We conclude that under the 1966 regulations, the discount income GMAC earned over the term of RISC's/fleet loans from retail/fleet customers was not the corresponding item of income in an intercompany transaction to the rate support deductions. Therefore, the GM group was not required to defer the rate support deductions on its consolidated income tax return.

To reflect the foregoing,

An appropriate order

will be issued.