146 T.C. No. 5

UNITED STATES TAX COURT

GUIDANT LLC f.k.a. GUIDANT CORPORATION, AND SUBSIDIARIES, ET AL.,[1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 5989-11, 5990-11, 10985-11, 26876-11, 5501-12, 5502-12.

Filed February 29, 2016.

Ps are a group of U.S. corporations which filed consolidated Federal income tax returns for the subject years. During those years Ps, primarily through the group's U.S. subsidiaries, consummated transactions with their foreign affiliates. The transactions included the licensing of intangibles, the purchase and sale of manufactured property, and services. R, relying upon his authority under I.R.C. sec. 482, adjusted the reported prices at which items were transferred

---

[1]The following cases are consolidated herewith: Cardiac Pacemakers, Inc., as substitute agent for the Guidant Consolidated Group, docket No. 5990-11; Cardiac Pacemeakers, Inc., as successor by merger to CPI Del Caribe, Ltd., docket No. 10985-11; Boston Scientific Corp. & Subs., docket No. 26876-11; Guidant, LLC f.k.a. Guidant Corporation and Subsidiaries, docket No. 5501-12; and Cardiac Pacemakers, Inc., as substitute agent for Guidant Consolidated Group, docket No. 5502-12.

between Ps and their foreign affiliates. R then determined the group's true consolidated taxable income (CTI) by posting all of the adjustments to the separate taxable income of the group's parent (which increased pro tanto the group's CTI) and without making any specific adjustment to any subsidiary's separate taxable income. R also did not determine any portion of the adjustments that related solely to tangibles, to intangibles, or to services. Ps assert that R's adjustments are arbitrary, capricious, and unreasonable as a matter of law because (1) R did not determine the "true separate taxable income" of each controlled taxpayer within the meaning of sec. 1.482-1(f)(1)(iv), Income Tax Regs., and (2) R did not make specific adjustments with respect to each transaction involving an intangible, a purchase and sale of property, or a provision of services.

Held: Neither I.R.C. sec. 482 nor the regulations thereunder require that R, when exercising his authority under I.R.C. sec. 482, always determine the true separate taxable income of each controlled taxpayer in a consolidated group contemporaneously with the making of the resulting adjustments.

Held, further, I.R.C. sec. 482 and the regulations thereunder allow R, when exercising his authority under I.R.C. sec. 482, to aggregate one or more related transactions instead of making specific adjustments with respect to each type of transaction.

Joel V. Williamson, Jonathan L. Hunt, Jason B. Grover, John T. Hildy, Thomas L. Kittle-Kamp, and Justin D. Hoag, for petitioners.

Jeffrey L. Bassin and Gretchen A. Kindel, for respondent.

## OPINION

LARO, Judge:  These cases are before the Court consolidated for purposes of trial, briefing, and opinion.  Petitioners petitioned the Court to redetermine the following Federal income tax deficiencies and accuracy-related penalty that respondent determined:[2]

Guidant LLC f.k.a. Guidant Corp. & Subs., docket No. 5989-11

| Year | Deficiency |
| --- | --- |
| 1997 | $4,958,493 |
| 2000 | 11,453,096 |
| 2001 | 214,674,105 |
| 2002 | 220,769,960 |

Cardiac Pacemakers, Inc., as substitute agent for the Guidant Consolidated Group, docket No. 5990-11

| Year | Deficiency |
| --- | --- |
| 2003 | $73,237,038 |

Cardiac Pacemeakers, Inc., as successor by merger to CPI del Caribe, Ltd., docket No. 10985-11

| Year | Deficiency |
| --- | --- |
| 1999 | $240,837,494 |

---

[2]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) applicable to the years at issue, and Rule references are to the Tax Court Rules of Practice and Procedure.

Boston Scientific Corp. & Subs., docket No. 26876-11

| Year | Deficiency |
|------|-----------|
| 2006 | $117,437,929 |
| 2007 | 36,611,782 |

Guidant, LLC f.k.a. Guidant Corp. & Subs., docket No. 5501-12

| Year | Deficiency |
|------|-----------|
| 1995 | $4,128,012 |

Cardiac Pacemakers, Inc., as substitute agent for Guidant Consolidated Group, docket No. 5502-12

| Year | Deficiency | Accuracy-related penalty sec. 6662(e)(1) |
|------|-----------|------------------------------------------|
| 2004 | $107,238,205 | -0- |
| 2005 | 16,168,621 | -0- |
| 4/21/2006 | 453,283,060 | $41,109,080 |

The deficiencies and the accuracy-related penalty flow from respondent's transfer pricing adjustments under section 482 that increased the income of Guidant Corp. and its U.S. subsidiaries (sometimes collectively, Guidant group) by approximately $3.5 billion. The Guidant group filed consolidated Federal income tax returns, and respondent's adjustments stem from transactions that the Guidant group engaged in with the group's affiliated foreign entities. Respondent determined for purposes of ascertaining the Guidant group's consolidated taxable

income (CTI) that all of the adjusted income was the separate taxable income (STI) of Guidant Corp. Respondent did not determine that any of the adjusted income was the STI of one or more of the Guidant group's U.S. subsidiaries. Respondent also did not determine the specific amount of the adjustments that related to tangibles, to intangibles, or to services.

Petitioners move for partial summary judgment, asserting that respondent's adjustments are arbitrary, capricious, and unreasonable as a matter of law. Such is so, petitioners argue, because (1) respondent did not determine the "true separate taxable income" of each controlled taxpayer in the Guidant group as required by section 1.482-1(f)(1)(iv), Income Tax Regs., and (2) respondent did not make specific adjustments with respect to each transaction involving an intangible, a purchase and sale of property, or a provision of services. Petitioners filed a memorandum in support of their motion and set forth their factual and legal positions in the memorandum. Respondent filed an objection to petitioners' motion and filed a memorandum (as later amended) setting forth his positions as to the motion. Petitioners filed a reply (as later amended) to respondent's objection.

The parties argued their respective positions at a hearing held in New York, New York. We now decide whether to grant the motion. We will deny it. We hold as to petitioners' former argument that neither section 482 nor the regulations

thereunder require that the Commissioner, when exercising his authority under section 482, always determine the true separate taxable income of each controlled taxpayer in a consolidated group contemporaneously with the making of the resulting adjustments.  We hold as to petitioners' latter argument that section 482 and the regulations thereunder allow the Commissioner, when exercising his authority under section 482, to aggregate one or more related transactions concerning an intangible, a purchase and sale of tangible property, or a provision of services, instead of making specific adjustments with respect to each type of transaction.

Background

I.     Preliminaries

We have derived the recitations listed in this background section primarily from the undisputed portions of each party's statement of the facts, as drawn from the pleadings and other acceptable materials.  We also have derived some of the recitations from the disputed portions of each party's statement of the facts, as viewed in a manner most favorable to respondent, the party opposing petitioners' motion for partial summary judgment.  We set forth all recitations solely for purposes of deciding petitioners' motion and not as findings of fact.  See

Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).

II. Guidant Group

A. Guidant Corp.

Guidant Corp. is a U.S. corporation that from 2001 through 2006 was the parent of an affiliated group that included its U.S. subsidiaries Cardiac Pacemakers, Inc. (CPI), CardioThoracic Systems, Inc. (CTS), Guidant Sales Corp. (GSC) , Advanced Cardiovascular Systems, Inc. (ACS), and Endovascular Technologies, Inc. (EVT). Boston Scientific Corp. (BSC) acquired Guidant Corp. on April 21, 2006. Guidant Corp. and each of its U.S. subsidiaries were thereafter separate members of the affiliated group of which BSC was the parent. Guidant Corp. remained the parent of its remaining subsidiaries for which it had been the parent before BSC acquired Guidant Corp.

Guidant Corp. and its U.S. and foreign business entities (collectively, subsidiaries) developed, manufactured, and sold medical devices. Guidant Corp. and its subsidiaries conducted business throughout the developed world.

B. Subsidiaries

For each subject year Guidant Corps.'s first-tier U.S. subsidiaries included CPI and CTS, and Guidant Corp.'s second-tier U.S. subsidiaries included GSC.

From 2001 through 2006 Guidant Corp.'s first-tier U.S. subsidiaries also included ACS and EVT.

Guidant Corp.'s first-, second-, and third-tier foreign subsidiaries included two Netherlands corporations, Guidant BV (renamed Guidant Group BV in 2003) and Guidant Puerto Rico BV, and one Luxembourg corporation, Guidant Luxembourg SARL. Guidant Puerto Rico BV and Guidant Luxembourg SARL were subsidiaries of Guidant BV.

Guidant Luxembourg SARL owned and operated a manufacturing facility through a branch, Guidant Ireland, established in Ireland. Guidant Puerto Rico BV owned and operated a manufacturing facility through a branch, Guidant Puerto Rico, established in Puerto Rico. Guidant Corp. provided administrative services to Guidant Ireland and to Guidant Puerto Rico.

III.    Guidant Group Business Units

A.    Background

The Guidant group consisted of various business units operated by separate corporations. From 2001 through April 21, 2006, these business units were Cardiac Rhythm Management (CRM), Endovascular Solutions (ES), Vascular Intervention (VI), and Cardiac Surgery (CS). On April 21, 2006, the Guidant

group sold its VI and ES business units. Thereafter, the Guidant group consisted of the CRM and the CS business units.

B.    CRM

CRM devices included pulse generators (PGs) (e.g., pacemakers, implantable cardiac defibrillators, and cardiac resynchronization devices) and leads.

CPI operated the CRM business unit during all subject years.

C.    ES

ES devices included an aortic vascular prosthesis (Ancure) that could be delivered via balloon catheter to treat aortic aneurysms.

EVT operated the ES business unit from 2001 through part of 2003. Guidant Endovascular Solutions, Inc. (GES), a U.S. corporation, assumed EVT's operations on January 1, 2004. GES did not participate in any of the controlled transactions at issue.

D.    VI

VI devices included balloon catheters used in angioplasty procedures, coronary stents and their delivery systems, and guidewires used to direct balloon catheters and stent delivery systems to the area of treatment.

ACS operated the VI business unit during 2001 through 2006.

E.    CS

CS devices included devices used to harvest femoral arteries from a patient for use in coronary artery bypass grafting surgery (Vasoview), off-pump coronary artery bypass (OPCAB) systems, and cardiac ablation devices.

CTS operated the CS business unit during all subject years.

IV.    Devices that Guidant Ireland or Guidant Puerto Rico Manufactured

A.    Guidant Ireland

Guidant Ireland manufactured PGs during all subject years.  Each PG contained a "hybrid," which is an electric circuit board to which integrated circuits and other electronic components are bonded.

Before 2004 Guidant Ireland purchased from CPI all of the hybrids that were incorporated into the PGs it manufactured.  Guidant Ireland began manufacturing hybrids in 2004.  From 2004 through 2007 Guidant Ireland manufactured PGs using both hybrids it manufactured and hybrids purchased from CPI.

From 2001 until the Guidant group sold the VI business, Guidant Ireland manufactured VI coronary stents and coronary stent delivery systems.  From 2005 until that sales date, Guidant Ireland also manufactured VI standalone balloon catheters for use in angioplasty procedures.

B.  <u>Guidant Puerto Rico</u>

Guidant Puerto Rico manufactured CRM leads and CS Vasoview devices during all subject years.  During 2002 and part of 2003, Guidant Puerto Rico also manufactured ES Ancure devices.  From 2002 until the Guidant group sold its VI business, Guidant Puerto Rico also manufactured VI guidewires.  From 2004 through the end of the subject years, Guidant Puerto Rico also manufactured CS cardiac ablation devices.  During 2007 Guidant Puerto Rico also manufactured CS OPCAB systems.

C.  <u>Sales of Devices</u>

GSC was the Guidant group's U.S. marketing and sales affiliate.  GSC sold and distributed to end users in the U.S. devices that Guidant Ireland or Guidant Puerto Rico manufactured.

Foreign Guidant Corp. distribution subsidiaries (Guidant foreign sales affiliates) sold in many countries outside of the U.S. devices that Guidant Corp. and its subsidiaries manufactured.  In a foreign market with a Guidant foreign sales affiliate, that affiliate sold and distributed to end users in its market devices that Guidant Ireland or Guidant Puerto Rico manufactured.  In foreign markets without a Guidant foreign sales affiliate, independent third-party foreign

distributors sold and distributed to end users devices that Guidant Corp. and its subsidiaries manufactured.

## V. Controlled Transactions Related to Devices That Guidant Ireland or Guidant Puerto Rico Manufactured

### A. Guidant Ireland CRM Devices

CPI owned intangible property related to CRM PGs and hybrids that it licensed to Guidant Ireland in exchange for royalties.

CPI manufactured and sold CRM hybrids to Guidant Ireland. Guidant Ireland sold finished CRM devices to GSC and to CPI. CPI resold the Guidant Ireland CRM devices it purchased to independent third-party foreign distributors. Guidant Ireland also sold finished CRM devices directly to Guidant foreign sales affiliates and to independent third-party foreign distributors.

### B. Guidant Puerto Rico CRM Devices

CPI owned intangible property related to CRM leads that it licensed to Guidant Puerto Rico in exchange for royalties.

Guidant Puerto Rico sold CRM leads it manufactured to GSC and to CPI. CPI resold the Guidant Puerto Rico leads it purchased to the Guidant foreign sales affiliates and to independent third-party foreign distributors. Guidant Puerto Rico also sold CRM leads it manufactured to Guidant Ireland. Guidant Ireland resold

the Guidant Puerto Rico leads it purchased to the Guidant foreign sales affiliates and to the independent third-party foreign distributors.

C.     Guidant Ireland VI Devices

ACS owned intangible property related to VI stents, stent delivery systems, and angioplasty balloon catheters that it licensed to Guidant Ireland.  Guidant Ireland paid ACS royalties in exchange for that license.

Before Guidant Ireland gained VI product sterilization capabilities in 2004, Guidant Ireland sold all of the VI devices it manufactured to ACS.  ACS sterilized the Guidant Ireland VI devices it purchased in return for a sterilization fee.  ACS resold the Guidant Ireland VI devices it purchased and sterilized to GSC, to the Guidant foreign sales affiliates, and to the independent third-party foreign distributors.

After Guidant Ireland gained VI product sterilization capabilities in 2004, Guidant Ireland continued selling its VI devices intended for the U.S. market to ACS.  ACS continued to resell these devices to GSC.  After Guidant Ireland gained VI product sterilization capabilities in 2004, Guidant Ireland also sold its VI devices intended for foreign markets to the Guidant foreign sales affiliates and to the independent third-party foreign distributors.

D.    Guidant Puerto Rico VI Devices

ACS owned intangible property related to VI guidewires that it licensed to Guidant Puerto Rico.  Guidant Puerto Rico paid ACS royalties in exchange for that license.

Guidant Puerto Rico sold all of the VI devices it manufactured to ACS. ACS sterilized the Guidant Puerto Rico VI devices it purchased in return for a sterilization fee.  ACS resold the Guidant Puerto Rico VI devices it purchased to GSC, to the Guidant foreign sales affiliates, and to the independent third-party foreign distributors.

E.    Guidant Puerto Rico ES Devices

EVT owned intangible property related to ES Ancure devices that it licensed to Guidant Puerto Rico.  Guidant Puerto Rico paid EVT royalties in exchange for that license.

Guidant Puerto Rico sold all of the ES devices it manufactured to EVT. EVT resold the Guidant Puerto Rico ES devices it purchased to GSC, to the Guidant foreign sales affiliates, and to the independent third-party foreign distributors.

F.     Guidant Puerto Rico CS Devices

CTS owned intangible property related to CS Vasoview devices, OPCAB systems, and cardiac ablation devices that it licensed to Guidant Puerto Rico. Guidant Puerto Rico paid CTS royalties in exchange for that license.

Guidant Puerto Rico sold all of the CS devices it manufactured to CTS. CTS resold the Guidant Puerto Rico CS devices it purchased to GSC, to the Guidant foreign sales affiliates, and to the independent third-party foreign distributors.

VI.    Audit

Respondent audited the consolidated Federal income tax returns that the Guidant group filed for 2001 through April 21, 2006, and the consolidated Federal income tax returns that BSC and its U.S. subsidiaries (BSC group) filed for 2006 and 2007. During the audits respondent considered, as to the years ended on or before April 21, 2006, whether income was allocated properly between the Guidant group and their foreign affiliates; and as to 2006 and 2007, whether income was allocated properly between the BSC group and their foreign affiliates. Respondent considered whether the transfer of intangible property, the sale of components and finished goods, and the provision of services with respect to certain products (collectively, transactions at issue) were made at arm's length.

For each subject year, the transactions at issue involved Guidant Corp., CPI, CTS, and GSC. The transactions at issue also involved ACS for 2001 through April 2006 and EVT for 2001 through 2003.

To evaluate whether income was allocated at arm's length between the Guidant group and their foreign affiliates, respondent considered petitioners' transfer pricing studies, as well as financial data and other information made available by petitioners and that was publicly available. In connection with the audit for 2006 and 2007, respondent also considered the methodologies and approaches taken with respect to the audit for the 2001 through April 2006 examination cycles. Respondent concluded that income was not allocated at arm's length between the Guidant group and their foreign affiliates and adjusted Guidant Corp.'s STI for each subject year to effect a pro tanto adjustment to the groups' CTI for those years. Respondent did not compute specific adjustments for each controlled taxpayer included in the group (member-specific adjustments). The IRS' practice is to compute member-specific adjustments when the taxpayer and the audit team can agree on such adjustments or when the audit team has sufficient information to make them. The IRS' practice is to defer making member-specific adjustments in other circumstances until a final resolution has been reached because these determinations often involve complex calculations, as well as

extensive and collaborative discussions with the taxpayer. Because the parties did not reach a resolution of the section 482 issue, respondent did not expend time or resources to determine member-specific adjustments for each Guidant group controlled taxpayer.

Respondent did not believe that he could independently make reliable member-specific adjustments on the basis of the information available to him. Respondent considered the complexity of the activities of each member of the Guidant group and its relationship with the activities of other members of the Guidant group and/or of their foreign affiliates. Respondent also concluded that he could not independently make reliable member-specific adjustments for each of the Guidant group members after considering the flow of products among Guidant group entities, involving multiple steps and multiple transfer pricing transactions. For many products, the flow involved a "round trip" from the United States to Ireland or to Puerto Rico and back.

Each Guidant group member's available financial statements encompassed all activities the entity performed and all products produced and sold, including those not at issue in these cases. Respondent was unable to extract the information necessary to ascertain the income reported by each Guidant group member with respect to the products and transactions at issue and to determine the STI of each

Guidant group member for the products and transactions at issue. Petitioners did not maintain their financial records in a manner that allowed them to readily track income and expenses by place of manufacture, and petitioners could not tie the income and expenses in the business unit financial statements to particular product lines, e.g., pulse generators or leads, or to products manufactured in the United States, in Ireland, or in Puerto Rico.

An example of the information that respondent needed to determine the income reported by each Guidant group member with respect to the products manufactured in Ireland and in Puerto Rico was the transfer prices paid by each Guidant group member. For the VI business, ACS purchased finished products from Guidant Ireland and Guidant Puerto Rico at a set transfer price. ACS then either resold these products to GSC or to Guidant group foreign distribution affiliates at a different transfer price or sold these products to an independent foreign distributor at a final sale price. Respondent did not have the transfer prices for any of these transactions so as to determine the profit reported by each Guidant group member for the products at issue. While the available information enabled respondent to make what he considered a reliable calculation of CTI for the Guidant group, he did not believe the available information enabled him to

make a sufficiently reliable calculation of member-specific adjustments for each of

the Guidant group members.

VII.   Deficiency Notices

A.   Deficiency Notice for 2001 and 2002

The deficiency notice for 2001 and 2002 described the section 482

adjustments as follows:

> It is determined under IRC section 482 that an adjustment is
> necessary to reflect an arm's length result for intercompany
> transactions that Guidant Corporation and its U.S. subsidiaries
> entered into with Guidant Corporation's directly and indirectly owned
> foreign subsidiaries regarding Cardiac Rhythm Management,
> Vascular Intervention, Cardiac Surgery, and Endovascular Solutions
> products produced in the Puerto Rico and Ireland manufacturing
> operations of Guidant Puerto Rico B.V. and Guidant Luxembourg
> during tax years 2001 and 2002.  In order to properly reflect an arm's
> length result for these intercompany transactions, Guidant
> Corporation's income for the tax years 2001 and 2002 is increased in
> the amount of $446,100,000 and $554,000,000, respectively.

The deficiency notice for 2003 described the section 482 adjustments as follows:

> It is determined under IRC section 482 that an adjustment is
> necessary to reflect an arm's length result for intercompany
> transactions that Guidant Corporation and its U.S. subsidiaries
> entered into with Guidant Corporation's directly and indirectly owned
> foreign subsidiaries regarding Cardiac Rhythm Management,
> Vascular Intervention, Cardiac Surgery, and Endovascular Solutions
> products produced in the Puerto Rico and Ireland manufacturing
> operations of Guidant Puerto Rico B.V. and Guidant Luxembourg
> during tax year 2003.  In order to properly reflect an arm's length
> result for these intercompany transactions, Guidant Corporation's

income for the tax year 2003 is increased in the amount of $481,000,000.

Those notices did not calculate or specify what, if any, amount of the section 482 adjustments was attributable to CPI, to ACS, to EVT, to CTS, or to GSC, or to specific types of controlled transactions.

B.      Deficiency Notice for 2004 through April 2006

The deficiency notice for 2004 through April 2006 described the section 482 adjustments as follows:

> It is determined under IRC section 482 that an adjustment is necessary to reflect an arm's length result for intercompany transactions that Guidant Corporation and its U.S. subsidiaries entered into with Guidant Corporation's directly and indirectly owned foreign subsidiaries regarding Cardiac Rhythm Management, Vascular Intervention, Cardiac Surgery, and Endovascular Solutions products produced in the Puerto Rico and Ireland manufacturing operations of Guidant Puerto Rico B.V. and Guidant Luxembourg during the tax years ended December 31, 2004, December 31, 2005, and April 21, 2006.  Therefore, in order to properly reflect an arm's length result for these intercompany transactions, taxable income is increased $627,800,000, $470,900,000, and $98,300,000 for the tax years ended December 31, 2004, December 31, 2005, and April 21, 2006, respectively.

That notice did not calculate or specify what, if any, amount of the section 482 adjustments was attributable to CPI, to ACS, to EVT, to CTS, or to GSC, or to specific types of controlled transactions.

C.     Deficiency Notice for 2006 and 2007

The deficiency notice for 2006 and 2007 described the section 482

adjustments as follows:

It is determined under IRC section §482 [sic] that an adjustment is
necessary to reflect an arm's length result for intercompany
transactions that Guidant Corporation and its U.S. subsidiaries
entered into with Guidant Corporation's directly and indirectly owned
foreign subsidiaries regarding Cardiac Rhythm Management and
Cardiac Surgery products produced in the Puerto Rico and Ireland
manufacturing operations of Guidant Group B.V., a controlled
foreign corporation of Guidant Corporation and 100% owner of
Guidant Luxembourg and Guidant Puerto Rico BV during tax years
2006 and 2007.  In order to properly reflect an arm's length result for
these intercompany transactions, Guidant Corporation's income for
tax years 2006 and 2007 is increased in the amount of $264,923,837
and $544,022,295, respectively.

This notice did not calculate or specify what, if any, amount of the section 482

adjustments was attributable to CPI, to CTS, or to GSC, or to specific types of

controlled transactions.

Discussion

I.     Overview

The Commissioner may "distribute, apportion, or allocate gross income,

deductions, credits, or allowances between or among * * * [controlled enterprises],

if he determines that such distribution, apportionment, or allocation is necessary in

order to prevent evasion of taxes or clearly to reflect the income of any such

[enterprises]".  Sec. 482; see also Eli Lilly & Co. v. Commissioner, 856 F.2d 855, 859 (7th Cir.1988), aff'g in part, rev'g in part, and remanding 84 T.C. 996 (1985); Bausch & Lomb, Inc. v. Commissioner, 92 T.C. 525, 581 (1989), aff'd, 933 F.2d 1084 (2d Cir. 1991).  The Commissioner's use of his powers under this provision is an exercise of discretion undertaken to place "a controlled taxpayer on a tax parity with an uncontrolled taxpayer by determining the true taxable income of the controlled taxpayer."  Sec. 1.482-1(a)(1), Income Tax Regs.; see also Bausch & Lomb, Inc. v. Commissioner, 92 T.C. at 581-582.

The Commissioner's authority to adjust items under section 482 is broad, and whether the Commissioner has inappropriately allocated items under section 482 is usually a question of fact.  See Eli Lilly & Co. v. Commissioner, 856 F.2d at 860; Bausch & Lomb, Inc. v. Commissioner, 92 T.C. at 581-582.  Taxpayers such as petitioners which ask the Court to reject the Commissioner's section 482 allocations in favor of the taxpayers' allocations must clear two hurdles in order to prevail.  First, a taxpayer must establish that the Commissioner abused his discretion by making allocations that are arbitrary, capricious, and unreasonable. See Eli Lilly & Co. v. Commissioner, 856 F.2d at 860; Sundstrand Corp. v. Commissioner, 96 T.C. 226, 353 (1991).  Second, a taxpayer must establish that arm's-length consideration for the adjusted transactions is consistent with the

taxpayer's allocations.  See Sundstrand Corp. v. Commissioner, 96 T.C. at 354.  In reviewing the reasonableness of the Commissioner's section 482 allocations, the Court focuses on the reasonableness of the result and not on the details of the methodology employed.  See Bausch & Lomb, Inc. v. Commissioner, 92 T.C. at 582.

Petitioners' motion for partial summary judgment addresses the first hurdle, specifically the issue of whether respondent abused his discretion.  Petitioners argue primarily that respondent abused his discretion because he failed to determine the true STI of each controlled taxpayer that engaged in the adjusted transactions.  As petitioners see it, section 482 and the applicable regulations require that the Commissioner, contemporaneously with making a section 482 adjustment in the setting of a consolidated return, determine the "true separate taxable income" (within the meaning of section 1.482-1(f)(1)(iv), Income Tax Regs.) of each controlled taxpayer joining in that return.  Petitioners note that respondent applied his section 482 adjustments solely to Guidant Corp. and observe that Guidant Corp. did not participate in most of the adjusted transactions.  Respondent agrees that Guidant Corp. did not participate in most of the adjusted transactions but counters that the Commissioner need not determine each controlled taxpayer's true STI whenever the Commissioner makes a section 482

adjustment in the setting of a consolidated return. Respondent asserts that, in such a setting, the Commissioner must determine the affiliated group's true CTI and that the Commissioner will determine each controlled taxpayer's true STI only to the extent that doing so will not interfere with the Commissioner's reliably determining taxable income from the controlled transactions underlying the section 482 adjustments.

Petitioners argue secondarily that respondent abused his discretion because he failed to make a section 482 adjustment with respect to each transaction involving an intangibles license, a purchase and sale of tangible property, or a provision of services. Instead, petitioners assert, respondent's adjustments were inappropriately made through a combined groupwide analysis on the basis of multiple types of controlled transactions among multiple corporations. Respondent counters as to petitioners' secondary argument that the Commissioner may aggregate transactions of different types for purposes of effecting a reliable section 482 adjustment.

II.    Rules Applicable to Summary Judgment

Either party may move for summary judgment on all or some of the legal issues in dispute. See Rule 121(a). Summary judgment expedites litigation and avoids unnecessary and expensive trials. See Craig v. Commissioner, 119 T.C.

252, 259 (2002). Summary judgment may be granted with respect to all or any part of the issues "if the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials, together with the affidavits or declarations, if any, show that there is no genuine dispute as to any material fact and that a decision may be rendered as a matter of law." Rule 121(a) and (b); Sundstrand Corp. v. Commissioner, 98 T.C. at 520. The moving party bears the burden of proving the absence of any genuine issue of material fact, and factual inferences are drawn in a manner most favorable to the party opposing summary judgment. See Craig v. Commissioner, 119 T.C. at 260.

III.    Petitioners' Primary Argument

Petitioners argue primarily that respondent's adjustments are arbitrary, capricious, and unreasonable as a matter of law because respondent did not determine the "true separate taxable income" of each controlled taxpayer within the meaning of section 1.482-1(f)(1)(iv), Income Tax Regs., when determining section 482 adjustments. Our analysis of this argument starts with a reading of the statute. See Allen v. Commissioner, 118 T.C. 1, 7 (2002). Nothing in the text of section 482 requires respondent to make member-specific adjustments to reflect income clearly. Petitioners do not dispute that the statute does not specifically set forth a member-specific adjustment requirement but argue that such a requirement

is found in the regulations interpreting the statute, specifically, in section 1.482-1(f)(1)(iv), Income Tax Regs. That section provides:

> (iv) Consolidated returns.--Section 482 and the regulations thereunder apply to all controlled taxpayers, whether the controlled taxpayer files a separate or consolidated U.S. income tax return. If a controlled taxpayer files a separate return, its true separate taxable income will be determined. If a controlled taxpayer is a party to a consolidated return, the true consolidated taxable income of the affiliated group and the true separate taxable income of the controlled taxpayer must be determined consistently with the principles of a consolidated return.

We construe the meaning of regulatory text using rules similar to the rules which we use to construe statutory text. See Caltex Oil Venture v. Commissioner, 138 T.C. 18, 32 (2012). We thus construe the quoted text of the regulations in accordance with its plain meaning, to the extent that we can. See id. We do not construe that text in isolation but ascertain its plain meaning through a lens that takes in the text and the intent of the regulations as a whole. Cf. United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988); United States v. Morton, 467 U.S. 822, 828 (1984).

We first turn to the plain language of section 1.482-1(f)(1)(iv), Income Tax Regs. The regulation distinguishes between a controlled taxpayer who files a separate return and a controlled taxpayer who is a party to a consolidated return. In the former case, the regulation states that the taxpayer's STI "will be

determined". In the latter case, the regulation lacks the same words, stating instead that the taxpayer's STI and the group's CTI "must be determined consistently with the principles of a consolidated return". The use of the words "will be determined" in the first instance mandates that the Commissioner determine a taxpayer's STI as part and parcel of his allocations under section 482. The absence of the same words in the second instance commands a different interpretation, to wit, in making section 482 adjustments the Commissioner must determine CTI and STI under the principles applicable to consolidated returns. The plain language of the regulation thus clearly mandates that both CTI and STI be determined, but the regulation does not specifically require that the Commissioner determine STI contemporaneously with his making of a section 482 adjustment.

We thus turn to the meaning of the words "consistently with the principles of a consolidated return" in section 1.482-1(f)(1)(iv), Income Tax Regs. Petitioner argues that this wording mandates that respondent should have determined the STI of the individual Guidant group members at the time of making section 482 adjustment to the group's CTI. Petitioner maintains that this interpretation is in line with the consolidated return regime, which requires that "consolidated taxable income is computed by first taking into account the separate taxable income of

each member of the group." Applied Research Assocs., Inc. v. Commissioner, 143 T.C. 310, 315 (2014); see also sec. 1.1502-11, Income Tax Regs. Respondent disagrees with this interpretation. We construe the words "consistently with the principles of a consolidated return" with the assistance of longstanding Supreme Court precedent and of contemporaneous legislative history revealing the intent of the consolidated return regime.

Four score and three years ago, the U.S. Supreme Court stated in the setting of two corporations desiring to file a consolidated return that "[t]he requirement of consolidated returns was 'based upon the principle of levying the tax according to the true net income and invested capital of a single business enterprise, even though the business is operated through more than one corporation.'" Atl. City Elec. Co. v. Commissioner, 288 U.S. 152, 154 (1933) (quoting Regs. 45, art. 631). The Supreme Court's statement parallels a statement that the Senate Finance Committee memorialized in its report on (and issued contemporaneously with) the birth of the consolidated return regime. See S. Rept. No. 65-617, (1918), 1939-1 C.B. (Part 2) 123 (stating that the consolidated return regime was adopted with an understanding that the "principle of taxing as a business unit what in reality is a business unit is sound and equitable and convenient both to the taxpayer and to the Government"). The legislative history and the Supreme Court statement reveal

that the primary principle underlying the consolidated return regime is a taxing of the true net income of the consolidated group as a whole. Cf. United Dominion Indus., Inc. v. United States, 532 U.S. 822, 836 (2001) (noting that the sole purpose of STI is that of "an accounting construct devised as an interim step in computing the group's [consolidated] taxable income or * * * [consolidated net operating loss]").

Further, interpretation of the consolidated return regulations by this Court reveals that "[t]he purpose of the consolidated return regulations is to provide rules so that the tax liability of a consolidated group will be clearly reflected and to prevent an avoidance of such tax liability." Gen. Motors Corp. v. Commissioner, 112 T.C. 270, 303 (1999). At the same time, this Court has long recognized that "[e]ach corporation is a separate taxpayer whether it stands alone or is in an affiliated group and files a consolidated return." Applied Research Assocs., Inc. v. Commissioner, 143 T.C. at 318 (quoting Elec. Sensing Prods., Inc. v. Commissioner, 69 T.C. 276, 281 (1977)).

We recognize that the consolidated return regulations state that the computation of CTI begins with a determination of each group member's STI. See sec. 1.1502-11, Income Tax Regs. We also recognize that the determination of STI is a component in the computation of CTI, and that the computation of CTI

may sometimes be affected by section 482 adjustments to an individual member's or members' STI. Following the "bottom to top" approach and determining STI before moving to a higher level of CTI would thus yield the most reliable results.

Yet we are also mindful that the term "true separate taxable income" is somewhat of a misnomer in that the true STI of a controlled taxpayer is not actually that taxpayer's taxable income which would be taxed were the taxpayer to have filed a separate tax return. Instead, STI serves as a recapitulation of each member's taxable items in accordance with the provisions of the Code, as possibly adjusted to reflect certain modifications and exclusions. See sec. 1.1502-12, Income Tax Regs. While the STI of each member is then combined into a single number, that combination is performed without regard to items such as net operating loss deductions, capital gains or losses, charitable contribution deductions, or dividends paid or received. Those items are calculated (and, where applicable, offset) only on a consolidated basis. See secs. 1.1502-11(a), 1.1502-12, Income Tax Regs.

Bearing the principles of the consolidated return regime in mind, we read section 1.482-1(f)(1)(iv), Income Tax Regs., to require the Commissioner to determine both CTI and STI when making a section 482 adjustment with respect to income reported on a consolidated return, but also giving the Commissioner a

certain latitude to decide when the determination of STI becomes necessary. The primary objective of section 482, as we discern from our reading of that section, is to prevent a distortion of income or an evasion of tax on account of controlled transactions that distort the taxable base. As we see it, the Commissioner's main responsibility under the regulation, when read in the light of the statute to which it relates, is to make sure that the section 482 adjustments serve the purposes of the consolidated return regime discussed above, i.e., reflect the consolidated group's true net income clearly and prevent an avoidance of such tax liability. See Atl. City Elec. Co. v. Commissioner, 288 U.S. at 154; Gen. Motors Corp. v. Commissioner, 112 T.C. at 303.

Consistent with the IRS practice on this matter, section 1.482-1(f)(1)(iv), Income Tax Regs., does not preclude the Commissioner from deferring making the "true" STI determination for each member until the time when such a determination is actually required. Of course when that time comes, e.g., when a determination of STI is needed to process setoffs under section 482, see, e.g., sec. 1.482-1(g)(4)(i), Income Tax Regs., or to process separate return limitation year items such as net operating losses, see sec. 1.1502-21, Income Tax Regs., the regulation requires that a member's STI must be determined consistently with the goal of taxing the consolidated group on its true CTI.

Our reading of section 1.482-1(f)(1)(iv), Income Tax Regs., is also consistent with the underlying purpose of both transfer pricing regulations and the consolidated return regime of preventing tax avoidance. Petitioners' suggested interpretation--requiring the Commissioner to make STI adjustments contemporaneously with section 482 adjustments in all cases--could completely eliminate the Commissioner's ability to make section 482 adjustments when a taxpayer consciously withholds or fails to maintain records of information necessary for STI adjustments. Our reading is also consistent with the principle of treating each corporation as a separate taxpayer regardless of the filing of a consolidated return because it requires the Commissioner to eventually determine the STI of each consolidated group member when making section 482 adjustments. While using the "bottom to top" approach would theoretically yield the most reliable results, we cannot require the Commissioner to use it in cases when taxpayers cannot provide the Commissioner with reliable information for member-specific adjustments. The determination of whether the Commissioner abused his discretion by making "top to bottom" section 482 adjustments beginning at the CTI level thus depends on the facts and circumstances of a given case.

On the basis of the record before us, which we must construe favorably to respondent as the party opposing the motion for partial summary judgment, respondent's revenue agents concluded that they were unable to make reliable member-specific adjustments on the basis of the available information. The agents reached their conclusion, in part, on the basis of the relationships between the Guidant group members and their foreign affiliates and on the alleged lack of documentation to make reliable adjustments. Each of petitioners' entities, including CPI, ACS, EVT, and CTS, performed numerous functions on behalf of its business unit and performed functions on behalf of other Guidant-group-related entities, including Guidant Ireland, Guidant Puerto Rico, GSC, and Guidant's sales affiliates. In addition, the Guidant group members each owned valuable intangibles relating to the development and manufacture of the products within their business units, and many products were manufactured both by a Guidant group member and by Guidant Ireland or Guidant Puerto Rico.

Petitioners allege that they maintained all the necessary information and records to make the STI determinations, but it would be too costly or otherwise difficult for respondent to extract that information at the time of the audit from petitioners' accounting databases. Whether respondent's decision to delay the STI computations constitutes abuse of discretion under these circumstances is thus still

in dispute and remains to be determined on the full record of the case as developed at trial.

For the reasons stated above, we will deny petitioners' motion to the extent of their primary argument. Section 482 and the regulations thereunder do not require that the Commissioner, when exercising his authority under section 482, always determine the true STI of each controlled taxpayer in a consolidated group contemporaneously with the making of the resulting adjustments. We do not now conclusively hold that respondent's section 482 adjustments in these cases are not arbitrary, capricious, or unreasonable as a matter of fact. We hold only that respondent's section 482 adjustments are not arbitrary, capricious, or unreasonable as a matter of law. Whether respondent's section 482 adjustments are or are not arbitrary, capricious, or unreasonable will be decided, to the extent necessary, on the basis of an evidentiary record built at trial.

IV.    Petitioners' Secondary Argument

Petitioners argue secondarily that respondent's section 482 adjustments are arbitrary, capricious, and unreasonable because he did not make separate adjustments for each transfer of tangible property, transfer of intangible property, and provision of service. Once again, the statute is silent as to this matter, so we turn to the regulations. The applicable regulations are found in section 1.482-1,

Income Tax Regs. The relevant portions of those regulations state (including, for some of the years, through incorporation of a cross-reference to section 1.482-1T, Temporary Income Tax Regs.):

(b) Arm's length standard.--(1) In general.--In determining the true taxable income of a controlled taxpayer, the standard to be applied in every case is that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. A controlled transaction meets the arm's length standard if the results of that transaction are consistent with the results that would have been realized if uncontrolled taxpayers had engaged in the same transaction under the same circumstances (arm's length result). * * *

(2) Arm's length methods.--(i) Methods.– * * * Sections 1.482-2 * * * [and certain other regulations prescribed under section 482] provide specific methods to be used to evaluate whether trans- actions between or among members of the controlled group satisfy the arm's length standard, and if they do not, to determine the arm's length result. * * *

(ii) Selection of category of method applicable to transaction.-- The methods listed in § 1.482-2 apply to different types of trans- actions, such as transfers of property, services, loans or advances, and rentals. Accordingly, the method or methods most appropriate to the calculation of arm's length results for controlled transactions must be selected, and different methods may be applied to interrelated trans- actions if such transactions are most reliably evaluated on a separate basis. For example, if services are provided in connection with the transfer of property, it may be appropriate to separately apply the methods applicable to services and property in order to determine an arm's length result. But see § 1.482-1(f)(2)(i) (Aggregation of transactions). * * *

* * * * * * *

(f) Scope of review.-- * * *

* * * * * * *

(2) Rules relating to determination of true taxable income.-- The following rules must be taken into account in determining the true taxable income of a controlled taxpayer.

(i) Aggregation of transactions.--(A) In general.--The combined effect of two or more separate transactions (whether before, during, or after the taxable year under review) may be considered, if such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's length consideration for the controlled transactions. Generally, transactions will be aggregated only when they involve related products or services, as defined in § 1.6038A-3(c)(7)(vii).[3]

* * * * * * *

(iv) Product lines and statistical techniques.--The methods described in § 1.482-2 through 1.482-6 are generally stated in terms of individual transactions. However, because a taxpayer may have controlled transactions involving many different products, or many separate transactions involving the same product, it may be impractical to analyze every individual transaction to determine its arm's length price. In such cases, it is permissible to evaluate the arm's length results by applying the appropriate methods to the overall results for product lines or other groupings. In addition, the arm's length results of all related party transactions entered into by a controlled taxpayer may be evaluated by employing sampling and other valid statistical techniques.

---

[3]Sec. 1.6038A-3(c)(7)(vii), Income Tax Regs., states: "The term "related products or services" means groupings of products and types of services that reflect reasonable accounting, marketing, or other business practices within the industries in which the related party group operates."

As we have discussed, section 482 gives the Commissioner broad discretion to allocate income between or among controlled enterprises in order to clearly reflect income or to prevent evasion of tax. Section 1.482-1(b)(1), Income Tax Regs., in turn, sets the standard for a clear reflection of income as that of a taxpayer dealing at arm's length with an uncontrolled taxpayer. Section 1.482-1(b)(2)(ii), Income Tax Regs., requires that the Commissioner determine the arm's- length consideration for each controlled transaction by using the most reliable method or means under the circumstances. Section 1.482-1(f)(2), Income Tax Regs., lets the Commissioner aggregate two or more separate transactions to the extent that aggregation serves as the most reliable means of determining the arm's length consideration for the transactions. Section 1.482-1(f)(2)(i), Income Tax Regs., adds that the combined effect of two or more transactions may be considered if such transactions, taken as a whole, are so interrelated that consideration of multiple transactions is the most reliable means of determining the arm's-length consideration for the controlled transactions.

Notwithstanding the strength of the regulations, petitioners argue that the Commissioner may not aggregate separate transactions involving tangibles, intangibles, or services. We disagree. The regulations let the Commissioner aggregate separate transactions involving tangibles, intangibles, or services when

doing so provides the best means of determining the true taxable income of a controlled taxpayer.  See, e.g., sec. 1.482-1(b)(2)(ii), (f)(2)(i), Income Tax Regs. While it is true that section 1.482-1(b)(2)(ii), Income Tax Regs., indicates generally that an arm's-length result may be calculated by separately applying one or more methods in the case of interrelated transactions, e.g., ones involving services and the transfer of property, the section then goes on by way of a reference to section 1.482-1(f)(2)(i), Income Tax Regs., to clarify that an aggregation of these transactions may sometimes be more appropriate.

The ability to aggregate transactions involving transfers of tangible property, transfers of intangible property, and provision of services is further confirmed by section 1.482-1(f)(2) (iv), Income Tax Regs., and by section 1.482-1(f)(2)(i)(B), Examples (2) and (3), Income Tax Regs.  The former section allows the Commissioner to "evaluate the arm's length results by applying the appropriate methods to the overall results for product lines or other groupings", because it may be impractical to analyze the arm's-length price of individual transactions.  In Example 2, transactions involving tangibles (finished computers), marketing intangibles, and service fees may be aggregated and considered together in determining the arm's-length consideration for the controlled transactions, because these transactions are so interrelated that they are most reliably analyzed

on an aggregated basis.  Example 3 has similar facts and a similar result, except it also incorporates the element of the choice of third-party comparables.  Example 3 concludes that using a controlled group of taxpayers unrelated to the U.S. parent and its subsidiaries identified in Example 2 would provide a more reliable measure of an arm's-length result than using three separate uncontrolled taxpayers each respectively performing similar functions as the three controlled subsidiaries.  The example indicates (and we so infer) that pricing of each separate transaction between the U.S. parent and the three controlled subsidiaries is not required because the information to perform such separate transaction pricing would not be available from the more reliable controlled group comparable.

In closing on this issue, we will deny petitioners' motion to the extent of their secondary argument.[4]  The transfer pricing regulations permit the Commissioner to aggregate interrelated transactions when doing so would produce "the most reliable means of determining the arm's length consideration for the controlled transactions."  Sec. 1.482-1(f)(2)(i), Income Tax Regs.  Whether respondent abused his discretion by aggregating transactions involving

[4]Petitioners also argue that the setoff rules and certain penalty provisions may not be applied appropriately if adjustments are not made by transaction types.  We are unpersuaded by these arguments for reasons already discussed.

intangibles, tangible goods, and provision of services, thus, is a question of fact that should be resolved on the basis of the trial record.

V.     Conclusion

We will deny petitioners' motion for partial summary judgment. We have considered all arguments that the parties made, and to the extent not discussed above, conclude that those arguments not discussed herein are irrelevant, moot, or without merit. To reflect the foregoing,

An appropriate order will

be issued.